*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0326p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

CHERYL D. LYONS,

        *Plaintiff-Appellee,*

    *v.*

No. 03-3282

CITY OF XENIA, et al.,

        *Defendants,*

CHRISTINE KEITH, Officer; MATTHEW FOUBERT,
Officer,

        *Defendants-Appellants.*

On Remand from the United States Supreme Court.
No. 99-00603—Walter H. Rice, District Judge.

Argued: September 10, 2003

Decided and Filed: August 4, 2005

Before: GIBBONS and SUTTON, Circuit Judges; TARNOW, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Lynnette P. Ballato, SUBASHI, WILDERMUTH & BALLATO, Dayton, Ohio, for
Appellants. Michael C. Thompson, Dayton, Ohio, for Appellee. **ON BRIEF:** Lynnette P. Ballato,
SUBASHI, WILDERMUTH & BALLATO, Dayton, Ohio, for Appellants. Michael C. Thompson,
Dayton, Ohio, for Appellee.

      SUTTON, J., delivered the opinion of the court. GIBBONS, J. (p. 12), delivered a separate
concurring opinion. SUTTON, J. (pp. 13-16), delivered a separate concurring opinion, in which
GIBBONS, J., joined. TARNOW, D. J. (pp. 17-22), delivered a separate dissenting opinion.

_____

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by
designation.

1

———————————

**OPINION**

———————————

SUTTON, Circuit Judge.  This case returns to us from the Supreme Court for reconsideration in light of the Court's recent opinion in *Brosseau v. Haugen*, 125 S. Ct. 596 (2004).  We previously held that Officer Christine Keith was entitled to qualified immunity from Cheryl Lyons' false-arrest claim; Officer Matthew Foubert was entitled to qualified immunity from Lyons' claim that he used excessive force in handcuffing her; and Officer Foubert was not entitled to qualified immunity from Lyons' claim that he used excessive force in tackling her in response to a distressed call for backup support from Officer Keith.  *See Lyons v. City of Xenia*, No. 03-3282, 90 Fed. Appx. 835 (6th Cir. Jan. 27, 2004).  Officer Foubert sought review of that part of our opinion denying him qualified immunity from Lyons' excessive-force tackling claim, and the Supreme Court vacated our judgment for reconsideration in light of *Brosseau*.  *See Foubert v. Lyons*, 125 S. Ct. 808 (2004).  After considering the Supreme Court's treatment of similar qualified-immunity issues in *Brosseau*, we now extend qualified immunity to Officer Foubert for Lyons' excessive-force tackling claim.  We leave undisturbed those parts of our prior opinion granting Officer Keith qualified immunity from Lyons' false-arrest claim and Officer Foubert qualified immunity from Lyons' excessive-force handcuffing claim.

I.

On the evening of August 18, 1998, Officer Christine Keith received a call to investigate an assault allegedly committed by Aiesha Ward, a sixteen-year old girl, and her friend Sara Dodd. Officer Keith initially went to the Dodd residence to obtain information from Sara's mother.  Aiesha was also present at the Dodd residence.  After obtaining the information necessary to issue a citation for Sara, Officer Keith told Aiesha that she wanted to speak with her mother and would follow Aiesha to her residence.

Upon arriving home, Aiesha told her mother, Cheryl Lyons, that a police officer was with her, at which time Officer Keith informed Lyons that Aiesha had assaulted another girl.  After several exchanges with Lyons, Officer Keith turned to Aiesha and asked for her name and address. Lyons interrupted and told her daughter to stop answering questions because Lyons needed more information.  Officer Keith responded that if she could not finish questioning Aiesha, Aiesha would have to come "downtown" with her, to which Lyons answered that Keith "was not taking her daughter anywhere."  Lyons claims that during this interchange she told Keith to leave, but that Keith refused, citing her need for information.  Lyons next told the officer to take a seat because she needed to take her blood pressure medicine.

When Lyons walked into the kitchen to get her medicine, Officer Keith followed her.  At that point, the verbal confrontation between the two women grew more heated as Officer Keith repeated her requests for information regarding Aiesha.  Responding to what she perceived as Officer Keith's "badgering," Lyons became angry and cursed at the officer.  Officer Keith claims that in response to Lyons' obscenities, she advised Lyons to calm down and cooperate.

At some point during this verbal exchange, Lyons noticed Officer Keith tightening her right fist down at her side.  Keith allegedly took an "aggressive" step toward Lyons, closing the space between the women from three feet to two.  Lyons then told the officer: "I'm not scared of you.  I know you cannot hit a police officer, I am not stupid."  Keith gives a different rendering of this remark, claiming that Lyons warned her that if she had not been wearing a badge, she would have "slap[ped] the 'sh[–]' out of" her.  According to Keith, Lyons continued to scream obscenities and "got up in [her] face," at which point Keith advised her to back down.  Lyons admits that both of them were "screaming."

Both women agree that Lyons made some sort of hand gesture at this point. According to Lyons, she raised her index finger at the officer, demanding, "[d]amnit, didn't you just hear what I said?" (referring apparently to wanting the opportunity to take her medicine before answering questions). Officer Keith describes the incident as Lyons "rais[ing] her hand towards" Officer Keith's face.

Officer Keith grabbed Lyons' wrist after the finger-pointing/hand-raising episode. In response, Lyons immediately pulled her wrist away. Although Officer Keith claims to have told Lyons she was under arrest, Lyons denies hearing this, claiming that she did not think she was being arrested. It is undisputed that Lyons pulled her wrist away from Officer Keith's grasp and either attempted to, or did, walk away.

According to Lyons, after she pulled her wrist away, she walked into the front room and Officer Keith followed her there. Lyons denies having any additional physical contact with Officer Keith aside from when Keith grabbed her wrist. By contrast, Officer Keith claims that after Lyons pulled her wrist back, the two women struggled as Keith attempted to handcuff Lyons, and Lyons ultimately punched her in the left eye during the struggle. Lyons denies hitting Officer Keith.

At some point during this struggle, all agree, Officer Keith radioed for backup. The call went to Officer Foubert who says he heard Officer Keith "yelling for help" with a distressed tone in her voice, as well as commotion in the background. Lyons claims that a few moments after Officer Keith made the call, Officer Foubert came running into the house through the front door at full speed. In what Lyons and Aiesha describe as a football tackle, Officer Foubert knocked Lyons to the ground. Lyons claims that her left knee hit the ground and that she was lying on her stomach, with Officer Foubert, a 5'11", 240 lb. man, on top of her midsection. She told the officer that she could not breathe. According to Lyons, Officer Foubert then "threw" Lyons on her right side, and handcuffed her arms behind her back.

Officer Foubert gives a different version of the events. As he entered the house, he saw the two women struggling with each other on the floor, side-by-side. By that time, Officer Keith had already placed a handcuff on one of Lyons' arms. Officer Foubert pulled Lyons away from Keith by picking her up, then leaned her over a chair, using a "balance displacement technique." It is undisputed that the two officers picked Lyons up under the arms following the tackle/balance displacement technique, and they assisted her out to Keith's cruiser. Keith transported Lyons to the station without further mishap, where she was charged with obstructing official business, assault and resisting arrest.

Lyons was tried before a jury, which acquitted her on all three charges. Following the acquittal, she filed suit against the City of Xenia, Chief of Police Eric Prindle, and Officers Keith and Foubert, raising claims under 42 U.S.C. § 1983 and state tort law. Because Lyons acknowledged in a pleading that all of her claims against the City of Xenia and Chief Prindle, as well as her claims brought under state law against all four defendants, were meritless, the district court entered summary judgment on these claims.

With respect to the claims remaining against Officers Foubert and Keith, Lyons alleged that the officers violated her Fourth Amendment rights by arresting her without probable cause and by using excessive force in the course of making the arrest. Reasoning that no evidence linked Officer Foubert to the false-arrest claim or Officer Keith to the excessive-force claim, the district court granted the officers' summary judgment motions on these claims. The district court, however, rejected Officer Keith's argument that as a matter of law she had probable cause to arrest Lyons and rejected Officer Foubert's argument that as a matter of law he did not use excessive force in arresting Lyons. The district court likewise rejected the officers' qualified immunity defenses. If

believed, the court concluded, Lyons' presentation of the evidence would show that the officers violated clearly established constitutional rights.

After the district judge denied qualified immunity on those three claims, the officers appealed. On January 27, 2004, we reversed the district court's denial of qualified immunity for all claims save Lyons' excessive-force tackling claim against Officer Foubert. Officer Foubert appealed the denial of qualified immunity on the remaining claim to the Supreme Court, which vacated our judgment on December 13, 2004, and remanded the case for reconsideration in light of *Brosseau*.

In the aftermath of the Supreme Court's decision, we asked the parties to provide supplemental briefs about the impact of *Brosseau* on this case and specifically asked them whether they would prefer the district court to address the issue in the first instance. Neither party requested that we initially remand the case to the district court.

II.

A.

*Brosseau* reaffirms the two-step process announced in, and supplements the reasoning of, *Saucier v. Katz*, 533 U.S. 194 (2001). In addressing qualified-immunity claims, *Saucier* instructed lower courts initially to consider whether "the facts alleged show the officer's conduct violated a constitutional right." *Id.* at 201. If the plaintiff can establish that a constitutional violation occurred, a court should ask "whether the right was clearly established . . . in light of the specific context of the case, not as a broad general proposition." *Id.*

*Brosseau* stemmed from an incident in which Officer Rochelle Brosseau "shot Kenneth Haugen in the back as he attempted to flee from law enforcement authorities in his vehicle." 125 S. Ct. at 597. Haugen filed an excessive-force § 1983 action, which the federal district court dismissed after holding that Brosseau was entitled to qualified immunity but which the Ninth Circuit reinstated. *See id.*

As the *Brosseau* Court noted, *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Graham v. Connor*, 490 U.S. 386 (1989), establish the governing constitutional rules regarding excessive force. In *Garner*, the Court held that the reasonableness of using deadly force to subdue a suspect hinges on whether the "officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." 471 U.S. at 11. And *Graham* held that excessive-force claims generally "are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." 490 U.S. at 388.

Expressing no view on the constitutional issue, *Brosseau* reversed the Court of Appeals' denial of qualified immunity. The qualified immunity inquiry, the Court stressed, "must be undertaken in light of the specific context of the case, not as a broad general proposition." 125 S. Ct. at 599 (quoting *Saucier*, 533 U.S. at 201). Although precedent "establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness," that is "not enough" to deny qualified immunity because "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense." *Brosseau*, 125 S. Ct. at 599 (quoting *Saucier*, 533 U.S. at 201). In "an obvious case," the Court acknowledged, the "general [excessive-force] tests set out in *Garner* and *Graham* . . . can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau*, 125 S. Ct. at 599; *see also Hope v. Pelzer*, 536 U.S. 730, 738 (2002). But Brosseau's case, the Court held, was "far from the obvious one where *Graham* and *Garner* alone offer a basis for decision." *Brosseau*, 125 S. Ct. at 599.

Turning to cases from the courts of appeals that more closely resembled the fact pattern at hand—which *Brosseau* described as "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight," *id.* at 600—the Court concluded that these "cases taken together undoubtedly show that this area is one in which the result depends very much on the facts of each case." *Id.* Because "[n]one of [the cases] squarely govern[ed]" *Brosseau*, the Court ultimately held that Officer Brosseau's actions "fell in the 'hazy border between excessive and acceptable force'" and that she was therefore entitled to qualified immunity. *Id.*

B.

*Brosseau* does not alter our prior treatment of (1) Lyons' false-arrest claim against Officer Keith and (2) her excessive-force handcuffing claim against Officer Foubert. The Court's command that qualified immunity is appropriate where "the result depends very much on the facts of each case" supports our prior analysis. *See id.* And neither claim, for that matter, was before the Court in Officer Foubert's petition for certiorari, which solely requested review of our denial of qualified immunity on Lyons' excessive-force tackling claim. We therefore reinstate the reasoning and holding of our prior opinion on these two claims. For the convenience of the reader, we include, with minor alterations, our analysis of these issues from our prior opinion.

1.

It has long been true that the Fourth Amendment requires probable cause for an arrest. *See Crockett v. Cumberland College*, 316 F.3d 571, 580 (6th Cir. 2003). And it has long been true that this inquiry turns on whether the "facts and circumstances within the officer's knowledge [ ] are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). Courts look at this question through the lens "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (citations omitted); *cf. Graham*, 490 U.S. at 396 (applying the same test in the context of judging the reasonableness of force used by officers).

In this instance, the City of Xenia charged Lyons with violating three of its ordinances: (1) obstructing official business; (2) assault; and (3) resisting arrest. To the extent probable cause exists for any one of these charges, the arrest was lawful and our analysis is complete. *See, e.g.*, *Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2003).

The Xenia ordinance against obstructing official business tracks the language of the Ohio code: "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's lawful capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." Xenia, Ohio, Ordinance § 608.06; Ohio Rev. Code Ann. § 2921.31. A conviction under the Ohio provision requires (1) the performance of an unprivileged act (2) with the purpose of preventing, obstructing or delaying the performance by a public official of an authorized act within his official capacity (3) which hampers or impedes the public official in the performance of his lawful duties. *City of North Ridgeville v. Reichbaum*, 677 N.E.2d 1245, 1248 (Ohio Ct. App. 1996).

Lyons' actions plainly satisfy the second and third elements of this probable-cause inquiry, as shown by the following sequence of events—which is not disputed, either because Lyons admitted to the conduct or because she did not contradict other evidence presented on the point. Lyons prevented Officer Keith from questioning her daughter, telling Aiesha not to answer any questions until Officer Keith provided more information. When Officer Keith responded that if she

could not finish questioning Aiesha, Aiesha would have to come "downtown" with her, Lyons replied that she "was not taking her daughter anywhere." Lyons then told Officer Keith that she needed to take her blood pressure medicine before they could continue the discussion, and she went into the kitchen to do so. After Keith followed her into the kitchen, Lyons cursed at Keith, and the altercation continued to intensify until the two women were "screaming" at each other. At some point during the encounter, Lyons pointed her index finger at Keith and swore at her again. On this record, it is clear that Lyons intended to, and did, delay Officer Keith's investigation.

The critical issue in the district court's view, and in ours as well, is whether these facts satisfy the first element of the test—the performance of an unprivileged act. Under Ohio law, this requirement demands an affirmative act that interrupts police business. *See City of Hamilton v. Hamm*, 514 N.E.2d 942, 943–44 (Ohio Ct. App. 1986). A person may not be convicted of the offense simply by doing nothing, such as refusing to provide identification or other information to the police. *See State v. McCrone*, 580 N.E.2d 468, 470–71 (Ohio Ct. App. 1989).

In deciding that Lyons' actions did not amount to sufficient affirmative acts to give rise to probable cause, the district court emphasized that the conduct of Lyons differed considerably from the affirmative acts of the defendant in *State v. Merz*, No. CA97-05-108, 2000 WL 1051837 (Ohio Ct. App. July 31, 2000). In *Merz*, the Ohio Court of Appeals sustained a conviction for obstructing official business where the defendant refused to provide identification when officers questioned him about dogs that he had allowed to run loose. *Id.* at *2. The defendant verbally abused the officers, physically moved away from them and into his house, and unequivocally indicated that he would physically resist any attempt by police to calm or restrain him—all of which, the court determined, combined to satisfy the affirmative-act requirement for obstructing official business. *Id.*

The facts of *Merz* and this case, as an initial matter, have more in common than the district court concluded. The defendant in *Merz*, it is true, took physical steps to resist the officers. But the Ohio Court of Appeals did not rely on this fact in determining whether the officers had probable cause to arrest. Rather, the court determined that probable cause existed *before* the defendant's physical resistance, when he "unequivocally indicated that he would not provide any identification and that he would physically resist any attempt to calm or restrain him." *Id.* While Lyons appears not to have made such an "unequivocal" statement of resistance to Officer Keith, she undoubtedly demonstrated her hostility and unwillingness to cooperate in physical and verbal ways.

More fundamentally, other Ohio courts have concluded that the affirmative-act requirement may be satisfied on the basis of conduct that is not far afield from what occurred here. For example, hostile or abusive speech that obstructs officers from fulfilling their duties may amount to a sufficient affirmative act to sustain a charge of obstructing official business. *See State v. Stayton*, 709 N.E.2d 1224, 1227 (Ohio Ct. App. 1998); *see also State v. Overholt*, No. 2905-M, 1999 WL 635717, at *3–4 (Ohio Ct. App. Aug. 18, 1999) (defendant's "interference with the officers' attempts to complete an arrest, coupled with his repeated, prolonged, and profane outbursts" were unprotected fighting words and constituted sufficient "acts" to support a charge under Ohio Rev. Code Ann. § 2921.31). If the volume and demeanor of the defendant make it impossible for police to question another individual, the act requirement is also met. *See City of Warren v. Lucas*, No. 99-T-0019, 2000 WL 655446, at *3 (Ohio Ct. App. May 19, 2000); *see also Reichbaum*, 677 N.E.2d at 1248–49 (finding sufficient affirmative acts where defendant prevented officers from questioning his stepdaughter about a neighbor's complaint of a disturbance at the defendant's home by repeatedly interrupting the questioning and refusing to be led away from his stepdaughter). Where the overall pattern of behavior is one of resistance, moreover, officers may consider the totality of the events and need not point to a single act that rises to the level of obstruction. *See id.* at 1248–49. *See also Overholt*, 1999 WL 635717, at *2 ("Rather than viewing the acts of a defendant in isolation, the total course of the defendant must be considered.").

Measured by the lessons from these precedents, Lyons' conduct would allow a reasonable officer to conclude that she had committed affirmative acts that interfered with police business. The complete picture after all includes more than just Lyons' refusal to provide information; it also includes profanity-laced yelling and finger-pointing at the officer, as well as the disruptive character of her speech—*i.e.*, its volume, demeanor, etc.—as in *Lucas*. Add to this Lyons' simultaneous refusal either to let Keith take Aiesha down to the station or to answer Keith's questions about Aiesha, and it becomes clear that Lyons' uncooperative and hostile behavior would give a reasonable officer cause to believe that an arrest for obstructing official business was appropriate.

Nor need we determine exactly where Ohio draws the line on the affirmative-act requirement. In ascertaining whether a constitutional violation occurred, the only question is whether Officer Keith had probable cause—not whether the evidence would be sufficient to support a conviction. *See Adams v. Williams*, 407 U.S. 143, 149 (1972) ("Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."). Neither need we determine whether Aiesha and her mother consented to Officer Keith's presence in the Lyons' house. The fact is, Lyons has only challenged the constitutionality of the seizure (*e.g.*, a false arrest claim), not the constitutionality of the search (*e.g.*, the entry into the house). On this record, Officer Keith's conduct did not rise to the level of a constitutional violation, and at all events in view of the less-than-precise contours of Ohio's affirmative-act requirement her conduct did not violate a clearly established constitutional right. Officer Keith accordingly is entitled to qualified immunity.

2.

Under the Fourth Amendment, as we have noted, individuals also have a right to be free of excessive force when police make an arrest or seizure. *See Graham*, 490 U.S. at 394–95. As with probable cause, this inquiry turns on the objective reasonableness of the officer's conduct in view of the facts and circumstances facing the officer. *Id.* at 397. In making this evaluation, courts look at "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (citation and quotation omitted).

According to Lyons, Officer Foubert initially handcuffed her "as tight as he could"—so that the handcuffs were "very, very, very tight." Aside from bruising on her wrist, Lyons does not allege any other injury stemming from the handcuffing and does not allege that the tightness of the handcuffs persisted beyond the moment of handcuffing. Nor does Lyons allege that she complained to Foubert about the tightness of the handcuffs and that he ignored her complaints.

The Fourth Amendment, it is true, prohibits unduly tight handcuffing in the course of an arrest. *See Martin v. Heideman*, 106 F.3d 1308, 1313 (6th Cir. 1997); *Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993). And this general principle, it is also true, was "clearly established" under Sixth Circuit case law at the time of Lyons' arrest. *See Martin*, 106 F.3d at 1313.

Not all allegations of tight handcuffing, however, amount to excessive force. In order to reach a jury on this claim, the plaintiff must allege some physical injury from the handcuffing, *see Neague v. Cynkar*, 258 F.3d 504, 508 (6th Cir. 2001), and must show that officers ignored plaintiff's complaints that the handcuffs were too tight, *see Burchett v. Kiefer*, 310 F.3d 937, 944–45 (6th Cir. 2002) (rejecting excessive-force claim as a matter of law where officers left defendant tightly handcuffed for three hours because defendant did not initially complain about the handcuffs, and when he did complain the officers responded promptly). *Cf. Martin*, 106 F.3d at 1313 (finding district court erred by granting qualified immunity because officers handcuffed the defendant so

tightly that his hands became numb and swollen, then failed to respond to the defendant's complaints of pain until 35 minutes later).

Lyons cannot satisfy these requirements. She alleges little in the way of physical injuries caused by the handcuffing. And, more critically, she does not allege that her physical complaints to the officers went unheeded. To the contrary, she does not even claim that she told the officers that the handcuffs were too tight. In the absence of an obvious physical problem caused by the handcuffs or a plea by the defendant to loosen them, it is fair to ask how a reasonable officer should know that a problem has occurred. These facts thus do not rise to the level of unconstitutionally excessive force. Because Lyons has failed to show that Officer Foubert used excessive force in handcuffing her, his request for qualified immunity should have been granted.

C.

In light of *Brosseau*, we now also extend qualified immunity to Officer Foubert on Lyons' excessive-force tackling claim. In doing so, we follow the two-step inquiry that *Saucier* required, *see* 533 U.S. at 201, and that *Brosseau* did not alter, *see* 125 S. Ct. at 598 & n.3. *See Meyers v. Redwood City*, 400 F.3d 765, 770 (9th Cir. 2005).

1.

First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. Speaking only for myself, I believe that they do not.

Whether Officer Foubert applied unconstitutionally excessive force in tackling Lyons turns on what a reasonable officer would have done under similar circumstances. The question is whether the undisputed facts "demonstrate that a hypothetical reasonable officer" would have "known that his actions, under the circumstances, were objectively unreasonable," *Scott v. Clay County*, 205 F.3d 867, 877 (6th Cir. 2000), not whether Officer Foubert used the least intrusive means available, *see Scott v. Heinrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable."); *see also Illinois v. Lafayette*, 462 U.S. 640 (1983) (noting in the Fourth Amendment context that reasonableness of governmental activity does not hinge on existence of a less-intrusive alternative).

Three sets of undisputed facts support my conclusion that Lyons has failed to state a constitutional claim: (1) Foubert was responding to a distressed call for backup help from a fellow officer who was inside a suspect's home and outside the view of the public; (2) based on the nature of the call, the location of the encounter and Lyons' admission that Foubert made a running unknocked-and-unannounced entry into the house, Foubert clearly (and fairly) believed that Keith was at risk; and (3) when Foubert entered the house, he saw Keith in close proximity to Lyons and the two of them yelling at each other.

Starting with the first point, the parties do not dispute the circumstances that prompted Foubert's sudden arrival on the scene. It is undisputed that Keith was alone during this confrontation, that she was inside the suspect's house and that she radioed Foubert for backup assistance when Lyons became agitated. When Foubert received the call, he detected a tone of distress in the voice of Keith, his partner of over two years, and he heard commotion in the background. Lyons does not contradict this version of events and indeed confirms that the two women were screaming at each other at about the time of the radio call.

Second, Lyons does not challenge Officer Foubert's perception, or the reasonableness of his perception, that Officer Keith was in distress. After receiving the radio call, Foubert understandably

feared for his partner's safety. That Keith was inside the suspect's residence—which contained an unknown number of persons and which was beyond public view—confirmed the perilousness of the situation. Nor does Lyons challenge the constitutionality of Foubert's decision to enter the house without a warrant and without knocking and announcing his presence, a form of entry that the Fourth Amendment permits only in certain emergency situations. *See Richards v. Wisconsin*, 520 U.S. 385, 394 (1997) ("In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile."); *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994) (describing the scope of the exigency exception to the warrant requirement, which encompasses "risk of danger to police or others"). While Lyons may not be in a position to contradict Foubert's testimony that he thought something "was going wrong" with Officer Keith, she confirms his testimony that he ran into the house, noting that he came "charging" into her house "like a football player" running at "as full speed as you can go in a house." Lyons has offered no explanation why it was unreasonable for Officer Foubert to do just that.

Third, when Foubert came running into the house, it is uncontradicted that he saw Keith and Lyons in close proximity to each other and that Lyons was considerably bigger than Keith. While Lyons denies that she was "wrestling" with Keith and denies punching her, she does not deny that at a minimum the two of them were in close proximity to each other and that considerable commotion and yelling surrounded the scene. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (non-moving party must aver specific facts that contradict moving party's version of the facts to receive favorable interpretation of disputed evidence). Indeed, at oral argument, Lyons' counsel agreed that the uncontradicted facts showed that the two women were "very close" to each other when Foubert rushed into the house and that the two women were yelling. Perceiving that Keith seemed scared and in need of assistance, Foubert proceeded to take control of the situation. Whether what happened next was a football-like "tackle" or the use of a "balance displacement technique" over a nearby chair (which is less of a euphemism than the reader might first suspect, *see Palshook v. Jarrett*, 120 F. Supp. 2d 641, 655–56 (N.D. Ohio 2000)) does not affect the reasonableness of Officer Foubert's actions under the circumstances.

Either way, it is uncontradicted that Lyons created an apparent threat of safety to an officer inside the confines of Lyons' own home. And it is uncontradicted that whatever the nature of the physical contact between Lyons and Officer Foubert, it did not result in anything approaching a serious physical injury. On this record, it is difficult to second-guess Foubert's decision quickly and aggressively to end the confrontation. Had Foubert charged into a room in which Lyons and Keith were far apart from each other, it might have presented a different situation. That, however, is not what happened. *See McVay v. Sisters of Mercy Health Sys.*, 399 F.3d 904, 908–09 (8th Cir. 2005) (holding that tackling did not amount to excessive force given that "[plaintiff] was disoriented and exhibiting signs of lacking mental control, that he was barreling toward glass doors that [the police officer] knew would not open, and the rapid pace of events as [the police officer] raced to reach [the plaintiff]"); *Smith v. Ball State University*, 295 F.3d 763, 771 (7th Cir. 2002) (holding that "the officers' minimal use of force was objectively reasonable given the totality of the circumstances," when an officer arrived late to the scene of an apparent crime, perceived two of his fellow officers struggling with a resisting suspect, and tackled the suspect to the ground based on what he believed was going on).

Where by contrast tackling has risen to the level of excessive force, that was because (1) the claimants did not pose a tenable threat to the officers' safety, *see Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003) (holding that it was objectively unreasonable to throw a lone woman to the ground for protesting a search warrant served by twelve IRS agents); *Santos v. Gates*, 287 F.3d 846, 854–56 (9th Cir. 2002) (determining that a jury could find police used excessive force against the plaintiff by throwing him to the ground and breaking his back after he had dropped to his knees with his hands behind his head and was admittedly "passive"); *McNew v. Pleasant*, No. 90 C 4825, 1992

WL 162255, at \*4 (N.D. Ill. July 6, 1992) (holding that a jury could find that the police used excessive force against a plaintiff who was walking through a park and whom the officers tackled, kneed and injured after he did not immediately stop when requested); (2) the police did more than just tackle the suspect, *see Phelps v. Coy*, 286 F.3d 295, 298, 302 (6th Cir. 2002) (court found constitutional violation for summary judgment purposes where plaintiff alleged that officers tackled him, hit him, and slammed his head into the floor three times); *Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991) (police tackled suspect and put him in a punishing "pain compliance hold"); or (3) the police did not have an adequate level of suspicion to justify any seizure at all, *see Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000); *cf. Vathekan v. Prince George County*, 154 F.3d 173, 180 (4th Cir. 1998) (holding that a jury could find objectively unreasonable a police officer's decision to set loose a police dog in a residential home without a verbal warning, when that dog mauled and seriously disfigured the plaintiff, who was sleeping at the time). Under these circumstances, I conclude that a constitutional violation has not been established in this instance.

2.

But even if that were not the case, even if Lyons in other words had established a cognizable constitutional claim, we hold that she cannot satisfy the second prong of the qualified-immunity inquiry. As *Brosseau* makes clear, "[q]ualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." 125 S. Ct. at 599. "Because the focus is on whether the officer had fair notice that her conduct was unlawful," *Brosseau* explains, "reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Id.* *Brosseau* leaves open two paths for showing that officers were on notice that they were violating a "clearly established" constitutional right—where the violation was sufficiently "obvious" under the general standards of constitutional care that the plaintiff need not show "a body" of "materially similar" case law, *id.*, and where the violation is shown by the failure to adhere to a "particularized" body of precedent that "squarely govern[s] the case here," *id.* at 599–600. Lyons has not satisfied either requirement for showing the violation of a "clearly established" constitutional right.

First, the constitutional violation, if any, was by no means an "obvious" one that the "general [excessive-force] tests set out in *Garner* and *Graham* . . . can 'clearly establish' . . . even without a body of relevant case law." *Id.* at 599. Even accepting all of Lyons' factual allegations as true, there is nothing "obvious" about what Officer Foubert should have done upon entering a house from which a fellow officer had just placed a distressed call for backup help and in which he could see immediately upon entering that the officer and resident were in close proximity to each other and in the middle of some form of confrontation. Indeed, neither at oral argument nor in any of the appellate briefs has Lyons or her counsel explained the obvious solution to the officer-safety problem faced by Officer Foubert. *Compare Hope*, 536 U.S. at 741 (noting that a right was clearly established when the "violation was so obvious that [the Court's] own Eighth Amendment cases gave respondents fair warning that their conduct violated the Constitution"); *see also Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 607 (6th Cir. 2005) (noting that instructions "'cast at a high level of generality' will only be sufficient to clearly establish the unlawfulness of the defendants' actions where the conduct at issue is 'obviously' a violation based on the prior cases," and finding that violation of a "two-pronged, multi-factor test [that] . . . did little to explain *how* the factors should be applied in the wide variety of factual circumstances facing school officials today" was "not such an obvious case").

Second, no precedent "squarely governs the case here." *Brosseau*, 125 S. Ct. at 600. As the cases that we have canvassed fairly indicate, the standards governing the constitutionality of Lyons' excessive-force tackling claim "depend[] very much on the facts of each case." *Id.* To that end, we

have been unable to identify a single case predating the conduct at issue that prohibits tackling in a materially similar context. "Because the focus is on whether the officer had fair notice that her conduct was unlawful," *id.* at 599, and because Officer Foubert's actions, as in *Brosseau*, at best "fell in the 'hazy border between excessive and acceptable force,'" *id.* at 600 (quoting *Saucier*, 533 U.S. at 206), Lyons has failed to show the violation of a clearly established right in this more "particularized" sense. *See Beard*, 402 F.3d at 608; *Randall v. City of Fairbanks*, 352 F. Supp. 2d 1028, 1037 (D. Alaska 2005) (interpreting *Brosseau* to mean that the law is not clearly established when it is "heavily dependent on the specific facts of each case and no case squarely addresse[s] the facts of this case"); *see also Saucier*, 533 U.S. at 198, 209 (granting qualified immunity to a police officer who half-dragged a protestor at a speech given by then-Vice President Gore and shoved or threw him inside a van after he unfurled a protest banner). Accordingly, Lyons' excessive-force claim fails as a matter of law.

III.

For these reasons, we reverse the district court's denial of qualified immunity to Officers Keith and Foubert and remand the case for further proceedings consistent with this opinion.

---

**CONCURRENCE**

---

JULIA SMITH GIBBONS, Circuit Judge, concurring. I agree with all of Judge Sutton's main opinion except its conclusion in Part II.C.1. that there is no genuine issue of fact as to whether Officer Foubert's conduct in tackling Lyons was a violation of her Fourth Amendment rights. In my view, the evidence presented by Lyons permits a jury finding that Foubert did not have a reasonable basis for believing that Officer Keith's safety depended on his use of physical force against Lyons in the form of tackling. Thus, I do not believe that the issue of whether Foubert unconstitutionally used excessive force can be resolved in the summary judgment context. Nevertheless, because I agree that Foubert is entitled to qualified immunity on the tackling claim for the reasons stated in Judge Sutton's opinion, I concur. I also concur in Judge Sutton's separate concurring opinion.

---

**CONCURRENCE**

---

SUTTON, Circuit Judge, with whom Judge GIBBONS joins, concurring. All three judges on the panel can agree on one thing: The constitutionality of Officer Foubert's use of force against Lyons is a difficult and fact-intensive question under our case law, but one that we nonetheless are obliged to reach at the outset under the two-step qualified-immunity inquiry announced in *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001); *see also Brosseau v. Haugen*, 125 S. Ct. 596, 598 & n.3 (2004). I cannot resist adding still another separate writing in this case that questions the rigidity of this requirement. While I see the virtue in telling lower courts that they should generally answer the constitutional question before the clearly established question, I wonder whether it makes sense to mandate that they do so in all cases, no matter the costs, no matter the ease with which the second question might be answered.

In *Saucier*, the Court for the first time held that whether "the facts alleged show the officer's conduct violated a constitutional right . . . *must be* the initial inquiry" in a qualified immunity case. *Id.* at 201 (emphasis added). "In the course of determining whether a constitutional right was violated on the premises alleged," the Court explained, "a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established." *Id.* Only then may courts turn to "the next, sequential step," namely "whether the right was clearly established." *Id.*

The requirement that lower courts review more difficult constitutional questions before turning to easier qualified-immunity questions, *Saucier* reasoned, is necessary to support the Constitution's "elaboration from case to case" and to prevent constitutional stagnation. *Id.* "The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case." *Id.*; *see also id.* at 207 ("Our instruction to the district courts and courts of appeals to concentrate at the outset on the definition of the constitutional right and to determine whether, on the facts alleged, a constitutional violation could be found is important. As we have said, the procedure permits courts in appropriate cases to elaborate the constitutional right with greater degrees of specificity."); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 842 n.5 (1998) ("What is more significant is that if the policy of avoidance were always followed in favor of ruling on qualified immunity whenever there was no clearly settled constitutional rule of primary conduct, standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals. An immunity determination, with nothing more, provides no clear standard, constitutional or nonconstitutional.").

As the Court has acknowledged, *see id.*, requiring courts preemptively to resolve constitutional questions where non-constitutional grounds for disposition remain readily available cuts against the normal grain of constitutional adjudication. The customary rule is that a court "will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *see also Clark v. Martinez*, 125 S. Ct. 716 (2005). Outside of the qualified-immunity context, I can think of just one setting in which federal courts *must* address constitutional questions before non-constitutional questions—when they adhere to the Article III requirement that they resolve jurisdictional issues before merits issues—and that rule plainly does not apply here. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold matter . . . is inflexible and without exception.").

*Saucier* and *Lewis* convincingly explain why the constitutional-avoidance doctrine does not naturally apply in the qualified-immunity setting. The constitutional and non-constitutional questions in a qualified immunity case overlap, and it often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be. And while injunction actions in civil cases and suppression motions and other pleadings in criminal cases provide avenues for the case-by-case development of the meaning of various constitutional guarantees, there is a risk that some constitutional guarantees would never become established (or would only slowly become established) if federal courts reflexively decided the second qualified immunity question before deciding the first one. All of this, however, just proves that the "better approach" in this area is to resolve the first inquiry before the second one, *Lewis*, 523 U.S. at 842 n.5. It does not prove that the approach should be followed in *all* cases, and indeed a majority of the Justices have questioned the value of this strict requirement in recent years. *See Brosseau*, 125 S. Ct. at 601 (Breyer, Scalia and Ginsburg, JJ., concurring) (noting that the *Saucier* inquiry requires that lower courts "decide difficult constitutional questions when there is available an easier basis for the decision" and that "when courts' dockets are crowded, a rigid 'order of battle' makes little administrative sense and can sometimes lead to a constitutional issue that is effectively insulated from review"); *Bunting v. Mellen*, 541 U.S. 1019, 1025 (2004) (Scalia and Rehnquist, JJ., dissenting from the denial of certiorari) ("We should either make clear that constitutional determinations are *not* insulated from our review . . . or else drop any pretense at requiring the ordering in every case."); *Saucier*, 533 U.S. at 216 (Ginsburg, Breyer and Stevens, JJ., concurring) (concurring in the judgment, "but not in the two-step inquiry the Court has ordered"); *Lewis*, 523 U.S. at 858–59 (Breyer, J., concurring) (arguing that lower courts should be able to "avoid wrestling with constitutional issues that are either difficult or poorly presented"); *id.* at 859 (Stevens, J., concurring) (noting that confronting the constitutional question first "is sound advice when the answer to the constitutional question is clear," but that, where "the question is both difficult and unresolved, . . . it [is] wiser to adhere to the policy of avoiding the unnecessary adjudication of constitutional questions").

There are occasional settings, it seems to me, in which a "rigid order of battle," *Brosseau*, 125 S. Ct. at 601 (Breyer, Scalia and Ginsburg, JJ., concurring), is difficult to justify. What of the district court that faces a complaint alleging dozens of constitutional violations? Must the court follow this sequence on every claim, even when some of the claims submit to easy resolution on the clearly established question? What of the appellate panel facing a set of briefs in which the constitutional question is not only difficult but inadequately briefed? Must the panel nonetheless ascertain the answer to the constitutional question, even when the clearly established answer is answerable after one reading of the briefs? And what of other settings: the appellate panel that cannot agree on the appropriate resolution of the constitutional question but can readily agree on the resolution of the clearly established question; the panel faced with a poorly presented constitutional question but an easily resolved clearly established question, *see Lewis*, 523 U.S. at 859 (Stevens, J., concurring); the panel faced with a constitutional question that is not only difficult but highly fact specific and therefore unlikely to provide meaningful guidance in future cases; or the panel faced with a constitutional question that is essentially irrelevant to the case at hand because of significant intervening developments in the law?

There are many possibilities here. And it is difficult to believe that every one of them favors an unyielding order of decision. Nor is it clear that requiring lower courts to decide the constitutional issue in settings like these—where all can readily agree on the answer to the clearly established question—will necessarily improve the courts' ability to decide each constitutional question correctly. Just as the Court has been right to identify the risk that the constitutional question might infrequently, if ever, be decided, *see Lewis*, 523 U.S. at 842 n.5, so there is a risk that constitutional questions may be prematurely and incorrectly decided in cases where they are not well presented.

Heightening these concerns is the fact that some constitutional rulings effectively will be insulated from review by the *en banc* court of appeals or the Supreme Court where the appellate panel identifies a constitutional violation but grants qualified immunity under the second inquiry. *See Bunting*, 541 U.S. at 1023–24 (Scalia and Rehnquist, JJ., dissenting from the denial of certiorari); *see also Horne v. Coughlin*, 191 F.3d 244, 247 (2d Cir. 1999); *Kalka v. Hawk*, 215 F.3d 90, 96 (D.C. Cir. 2000). By multiplying constitutional holdings that are not subject to review in the normal course, a rigid application of the two-step inquiry may do as much to unsettle the law as to settle it.

An unbending requirement in this area produces another oddity: The same lower-court judges that are supposed to adhere to this rule are given complete discretion over whether to publish a given decision. Appellate panels that choose not to publish a decision no more create binding precedent than those that decide only the clearly established question. *See Wilson v. Layne*, 526 U.S. 603, 623–24 & n.6 (1999) (Stevens, J., dissenting) (recognizing that the Fourth Circuit has adopted a rule that unreported opinions may not be considered in the course of determining qualified immunity) (citing *Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir. 1996)). Lower federal courts given the authority to exercise judgment about when to publish their decisions, it seems to me, ought to be given authority occasionally to decide the last qualified immunity question before the threshold one. The same administrative concerns that permit the former ought to permit the latter.

Finally, while the risk of stagnating constitutional doctrines is a legitimate one, it is not self-evident that the problem has impeded the growth of American constitutional law. The same risk exists in other areas of law—both judge-made (the harmless-error doctrine, the rule announced in *Teague v. Lane*, 489 U.S. 288, 299–310 (1989)) and legislatively made (the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d)(1)). And yet the ability of courts to skip to the second inquiry (*e.g.*, to go straight to the harmlessness of the error or *Teague*'s new-rule inquiry, *see, e.g.*, *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994) (permitting federal habeas courts to ask whether a habeas petitioner's claim implicates a "new" rule and is therefore barred by *Teague* before addressing the claim on the merits)) does not seem materially to have inhibited the development of constitutional law.

The existence of these rules as well as the authority not to make a published federal case about every dispute suggests two things. One, the point is not to *maximize* the number of constitutional rulings but to *optimize* constitutional rulings, as traded off against essential administrative values, such as the accurate, efficient and timely resolution of cases in the federal courts. Two, even in the absence of rules mandating that they address the constitutional issue first, courts routinely do so on their own. *See, e.g.*, *Pope v. Illinois*, 481 U.S. 497, 501–04 (1987) (addressing constitutional question before determining whether any error was harmless). Addressing a more concrete issue (was there a constitutional violation?) before turning to a more abstract issue (was it clearly established?) will generally present an easier mode of analysis than approaching matters the other way around.

Much as the *Saucier* two-step inquiry is a reasoned departure from the general rule that a court "will not pass upon a constitutional question" unless essential to the disposition of a case, *see Ashwander*, 297 U.S. at 347 (Brandeis, J., concurring), so also the Court should permit lower courts to make reasoned departures from *Saucier*'s inquiry where principles of sound and efficient judicial administration recommend a variance. Here, as elsewhere, avoiding difficult and divisive constitutional questions will at times promote, not hinder, the enforcement and development of the law.

The alternative, as the four separate opinions from this three-judge panel illustrate, is to require courts to issue narrow, panel-riven, fact-bound constitutional rulings of limited precedential value, only to have them then announce that the government officials are entitled to qualified

immunity because the precedents "taken together undoubtedly show that this area is one in which the result depends very much on the facts of each case." *Brosseau*, 125 S. Ct. at 600. And of course in *Brosseau* itself, the very case that prompted the Court to ask us to take a second look at this case, the Court did not address the constitutional question but only the clearly established question. Lower federal courts ought to have the same authority.

---

**DISSENT**

---

ARTHUR J. TARNOW, District Judge, dissenting.  I must respectfully dissent from the majority's opinion.  Having reconsidered my position on the excessive force claim in light of *Brosseau v. Haugen,* __ U.S. __, 125 S. Ct. 596 (2004), I remain convinced that a jury should decide whether Officer Foubert is entitled to qualified immunity.

### I.  Officer Keith and the Claim of False Arrest

In focusing its analysis only upon whether Officer Keith had probable cause to arrest Lyons, the majority ignores two critical aspects of this case:  the situs of the arrest and the absence of a warrant.  "The Fourth Amendment 'has drawn a firm line at the entrance to the house,' a threshold which police officers may not cross without a warrant." *Ingram v. City of Columbus,* 185 F.3d 579, 586-87 (6th Cir. 1999) (quoting *Payton v. New York,* 445 U.S. 573, 589 (1980)).  At the time of Lyons's arrest, it was clearly established that warrantless arrests occurring inside the home require a showing of probable cause and exigent circumstances. *See Payton,* 445 U.S. at 590.  As explained by the *Payton* Court:

> To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home.  This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present.

*Id.* at 588-89 (quoting *United States v. Reed,* 572 F.2d 412, 423 (2d Cir. 1978)). *See also Welsh v. Wisconsin,* 466 U.S. 740, 748 (1984) ("It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'") (quoting *United States v. United States Dist. Court,* 407 U.S. 297, 313 (1972)); *Silverman v. United States,* 365 U.S. 505, 512 n.4 (1961) ("A sane, decent, civilized society must provide some . . . oasis, some shelter from public scrutiny, some insulated enclosure, some enclave, some inviolate place which is a man's castle.") (quoting *United States v. On Lee,* 193 F.2d 306, 315-16 (2d Cir. 1951) (Frank, J., dissenting)).  Warrantless searches and seizures occurring inside the home are presumptively unreasonable. *Payton,* 445 U.S. at 586.

The Supreme Court recently reiterated the *Payton* rule in *Kirk v. Louisiana,* 536 U.S. 635, 638 (2002).  Additionally, the rule is understood in the Sixth and other U.S. Circuits, and under Ohio law. *See Martin v. Mitchell,* 280 F.3d 594, 607 (6th Cir. 2002); *Ingram,* 185 F.3d at 587; *United States v. Morgan,* 743 F.2d 1158, 1161 (6th Cir. 1984); *Cleveland v. Shields,* 663 N.E.2d 726, 728 (Ohio Ct. App. 1995); and *Duncan v. Storie,* 869 F.2d 1100, 1102 (8th Cir. 1989). *See also Loria v. Gorman,* 306 F.3d 1271 (2d Cir. 2002), and *Hegarty v. Somerset County,* 53 F.3d 1367 (1st Cir. 1995) (both analyzing warrantless home arrests in the context of qualified immunity).  The burden of proving exigency is upon the government. *Morgan,* 743 F.2d at 1162.

The majority reasons that, as long as probable cause exists for any of the three offenses with which Lyons was charged – obstructing official business, assault, and resisting arrest – the arrest was lawful and the Court's analysis is complete.  The majority found there was probable cause to arrest Lyons for obstructing official business.  Because the arrest occurred in the home, this reasoning, which omits any analysis of exigent circumstances, is incorrect.  In addition, I disagree

with the majority's finding that Officer Keith had probable cause to arrest Lyons for obstructing official business.

A conviction for obstructing official business under either the Xenia Ordinance or the Ohio Code requires a showing of (1) the performance of an unprivileged act, (2) done with the purpose of preventing, obstructing, or delaying the performance by a public official of any authorized act within his or her official capacity, and (3) which hampers or impedes the public official in the performance of lawful duties. *See* Xenia, Ohio, Ordinance § 608.06; Ohio Rev. Code Ann. § 2921.31. Under Ohio law, an unprivileged act means an affirmative act which interrupts police business. *See City of Hamilton v. Hamm,* 514 N.E.2d 942, 943-44 (Ohio Ct. App. 1986).

The majority, finding that Lyons committed an unprivileged act, reasons:

> The complete picture after all includes more than just Lyons' refusal to provide information; it also includes profanity-laced yelling and finger-pointing at the officer, as well as the disruptive character of her speech – i.e. its volume, demeanor, etc . . . . Add to this Lyons' simultaneous refusal either to let Keith take Aiesha down to the station or to answer Keith's questions about Aiesha, and it becomes clear that Lyons' uncooperative and hostile behavior would give a reasonable officer cause to believe that an arrest for obstructing official business was appropriate.

It is important to note that, under Lyons's version of the events, she never affirmatively gave Officer Keith permission to enter her home. Rather, Officer Keith entered the home behind Aiesha, and Lyons was shocked to find her there. Even if this Court assumes that Lyons's lack of objection to Officer Keith's entry amounted to consent, the majority omits the fact that Lyons told Officer Keith to leave her home after Officer Keith refused to provide further background information and before Lyons went to take her blood pressure medication. Until that point, she had done nothing except refuse to provide information, which does not amount to an obstruction of justice under Ohio law. *See State v. Collins,* 623 N.E.2d 1269, 1270 (Ohio Ct. App. 1993), *overruled on other grounds by State v. Tolliver,* 1996 WL 715438 (Ohio Ct. App. Dec. 13, 1996); *see also Simmons v. United States,* 390 U.S. 377, 394 (1968) (one cannot be penalized for exercising her constitutional rights).

Thus, Lyons revoked her consent before most of the events constituting an affirmative act occurred. Because Officer Keith had no warrant, she had no official right to remain in Lyons's home after Lyons ordered her to leave. *Cf. Painter v. Robertson,* 185 F.3d 557, 567 (6th Cir. 1999); *State v. Rojas,* 635 N.E.2d 66, 67 (Ohio Ct. App. 1993) (both explaining that an individual may limit or revoke consent to a search). It follows then, that the events which occurred after Lyons directed Officer Keith to leave cannot fairly be used to establish an affirmative act which interrupted police business. Since Lyons did not commit an affirmative act which interrupted police business, there is no need to determine whether the second and third requirements for the offense of obstruction were met.

Furthermore, the government made no showing of exigency. The phrase "exigent circumstances," in conjunction with an arrest occurring in the home, "refers to a situation where the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *Morgan,* 743 F.2d at 1162. Exigent circumstances have been found to exist where officers are engaged in hot pursuit; the suspect presents an immediate threat to the safety of the officer or society; or the suspect is about to escape. *Id.* at 1162-63. Accepting as true Lyons's version of the

events, I do not believe any reasonable officer could have concluded there was an "urgent need" to arrest her. *See id.* at 1162.[1]

Moreover, in *Welsh,* 466 U.S. at 753, the Supreme Court explained that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." The Court noted that the exigent circumstances exception to the warrant requirement should rarely be sanctioned when the underlying offense is minor. *Id. See also Payton,* 445 U.S. at 576 (limiting the exigent circumstances exception to felony cases).

None of the offenses with which Lyons was charged are sufficiently grave or violent to allow the police to ignore the warrant requirement. *See* City of Xenia, Ohio, General Offenses Code §§ 608.06, 608.08, & 636.02 (defining each of the charged offenses as misdemeanors). Because the arrest was not lawful, Lyons had the right to resist the arrest. *See* City of Xenia, Ohio, General Offenses Code § 608.08(b) (making "lawful arrest" an element of the crime of resisting arrest); *see also State v. Campana,* 678 N.E.2d 626, 629 (Ohio Ct. App. 1996) & *Elyria v. Tress,* 595 N.E.2d 1031, 1034 (Ohio Ct. App. 1991) (both explaining that, where a statute makes "lawful arrest" an element of the crime of resisting arrest, an individual may resist an unlawful arrest).[2] Therefore, Officer Keith is not entitled to qualified immunity.[3]

## II. Officer Foubert and the Claim of Excessive Force

### A. Was There a Violation of a Constitutional Right?

As noted by the majority, the constitutionality of Officer Foubert's action hinges upon the objective reasonableness of his conduct and depends upon the following factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396 (1989). *See also* Ohio Department of Natural Resources (ODNR) Directive § I(A) (February 5, 2001) ("Force used must be: *the most logical, reasonable, and absolutely necessary response* under the circumstances."). Determining whether the amount of force used was reasonable requires a balancing of "'the nature and quality of the intrusion on the

---

[1] The Sixth Circuit has observed that, whether exigent circumstances exists is a question for the jury if there is room for difference of opinion. *See Ingram v. City of Columbus,* 185 F.3d 579, 587 (6th Cir. 1999). Here, however, there is no room for a difference of opinion because the government made absolutely no showing of exigency. Since there were no exigent circumstances, it is irrelevant whether Officer Keith had probable cause to arrest Lyons for assault and resisting arrest.

[2] In *City of Columbus v. Fraley,* 324 N.E.2d 735 (Ohio 1975), the Ohio Supreme Court recognized severe limitations upon the common law right of an individual to resist an unlawful arrest. The Court held, "In the absence of excessive or unnecessary force by an arresting officer, a private citizen may not use force to resist arrest by one he knows, or has good reason to believe, is an authorized police officer engaged in the performance of his duties, whether or not the arrest is illegal under the circumstances." *Id.* at 746 (syl. no. 3 by the Court). The court in *Elyria v. Tress,* 595 N.E.2d 1031, 1034 (Ohio Ct. App. 1991), pointed out that the *Fraley* Court did not have before it a resisting arrest statute making lawfulness an element of the crime of resisting arrest.

[3] This case is distinguishable from *City of North Ridgeville v. Reichbaum,* 677 N.E.2d 1245 (Ohio Ct. App. 1996), in that the arrest in that case occurred outside the suspect's home. Thus, there would have been no need for the court to determine whether exigent circumstances existed. I, therefore, disagree with the majority's application of *Reichbaum,* as well as *State v. Merz,* 2000 WL 1051837 (Ohio Ct. App. Dec. 13, 1996) to this case. The court's analysis in *Merz* failed to include exigent circumstances. Also, the case is distinguishable in that exigent circumstances could have been found because (1) the suspect attempted to flee, and (2) the dogs he allowed to run loose had attacked other people. No similar circumstances existed in this case.

individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396.

In the instant case, the first *Graham* factor does not favor the majority's position because the offenses with which Lyons was charged are not severe. Nor does the second *Graham* factor bolster his position when viewing the facts in the light most favorable to Lyons. Under her version of the events, the most that she was doing when Officer Foubert charged into the home was standing in close proximity to, and screaming at, Officer Keith. I do not believe, then, that the "tackling" move used by Officer Foubert was "absolutely necessary." At best, the amount of force used by Officer Foubert was borderline under the ODNR Use of Force Continuum.

The majority makes much of the fact that Officer Keith was alone in Lyons's home at the time Foubert entered and that Lyons confirmed that Foubert charged into the home "like a football player." That Lyons confirmed Foubert's manner of entry, however, does not make the entry reasonable. Nor does it necessarily confirm that Foubert reasonably feared for Officer Keith's safety.

Moreover, the fact that Lyons's physical injuries were not severe is not fatal to her case. In *Ingram,* 185 F.3d at 597, this Court explained that a plaintiff "may allege use of excessive force even where the physical contact between the parties did not leave excessive marks or cause extensive physical damage." Section 1983 claims of excessive force encompass emotional harm and do not necessarily require allegations of assault. *Id. See also Holmes v. City of Massillon, Ohio,* 78 F.3d 1041, 1048 (6th Cir. 1996) ("This court is not insensitive to the mental anguish that can affect a victim of police brutality and we realize that this emotional harm can often be quite difficult to measure in mere monetary terms.").

One of the cases upon which the majority relies in concluding that Officer Foubert's action was objectively reasonable is *Smith v. Ball State University,* 295 F.3d 763 (7th Cir. 2002). That case, however, is distinguishable. The plaintiff in *Smith* was a university student who suffered from juvenile diabetes. He lapsed into diabetic shock while driving his car and drove onto a sidewalk on the university campus. The campus police were dispatched by a campus shuttle bus driver, who reported a possible drunk driver and stated that the vehicle nearly struck several pedestrians. The police then dispatched a student who worked as a parking attendant, and asked him to investigate the situation. The student approached the car, observed the plaintiff seated in the front, and noted that the car was running. He then tapped on the window, but the plaintiff did not respond. The student contacted police dispatch and told them the plaintiff was incoherent (and may or may not have been intoxicated or on drugs).

Several minutes later, two campus police officers arrived on the scene. After turning off the ignition, they asked the plaintiff to exit the vehicle. The plaintiff did not respond. The officers then forcibly removed the plaintiff from the car. As they were removing him, a third officer arrived on the scene. Because the first two officers were forcibly removing the plaintiff from his car, the third officer believed the officers and the plaintiff were engaged in a struggle. He attempted to apply a "knee strike" to the plaintiff's leg but slipped, tackling his fellow officers and the plaintiff. The three officers then held the plaintiff's face to the ground and handcuffed him. When they finally raised the plaintiff to a seated position, one of the officers recognized him from a previous diabetic shock episode.

In determining that the use of force was not excessive, the Seventh Circuit considered the potential threat which a drunk driver poses to public safety. *Id.* at 770. The court concluded that the third officer had reason to believe his fellow officers and the plaintiff were engaged in a struggle. *Id.* at 771.

The majority also relies on, *inter alia, McVay v. Sisters of Mercy Health System,* 399 F.3d 904 (8th Cir. 2005). There, the plaintiff's decedent presented to a hospital emergency room with symptoms of alcohol withdrawal, including lack of mental control and disorientation. He wandered from his room, and a police officer, employed by the hospital as a security guard, found him talking to imaginary people. Assuming the decedent was under the influence of an unknown substance, the officer arrested him and attempted to escort him to his room. When the pair reached the room, the decedent ran toward the exit doors, consisting of two sets of double doors made partially of glass. The officer knew the second door would not open. He chased the decedent and grabbed him after he had passed through the first set of doors. The two fell to the floor, and the decedent suffered a fatal head injury.

The decedent's mother sued the hospital, the officer, and the city, claiming that the officer had tackled her son and that the tackling constituted excessive force. The defendants moved for summary judgment, arguing that qualified immunity shielded the officer's actions. The district court granted the motion. The Eighth Circuit affirmed, concluding that the officer had not violated the decedent's constitutional rights because, at the time of the incident, the decedent was disoriented and running toward glass doors, which might have shattered and caused severe injury. At the very least, the court reasoned, the decedent was a danger to himself. *Id.* at 908-09.

In the instant case, Lyons was in her own home at the time of the arrest and was clearly not a danger to herself or to the public. Unlike the non-responsive plaintiff in *Smith* and the disoriented arrestee in *McVay,* Lyons was able to give her own version of events, which contradicts that of Officer Foubert. Under Lyons's version (which did not have her and Officer Keith rolling around on the floor when Officer Foubert entered the home), she was not a threat to either Officer Keith or Officer Foubert. In any event, she was not the type of threat which would warrant her being "tackled," or otherwise placed in such a degrading position, in her own home.[4]

Finally, the conclusion that the amount of force used may have been excessive takes into account the unlawfulness of the arrest. I am certainly mindful that this Circuit has declined to address the issue of whether an unlawful arrest necessarily makes any use of force excessive. *See, e.g., Young v. Barrett,* 912 F.2d 466 (6th Cir. 1990) (unpublished). The plaintiff in *Young,* however, relied upon *Schiller v. Strangis,* 540 F. Supp. 605, 617 (D. Mass. 1982), which considered the unlawfulness of the arrest in determining whether the amount of force used was reasonable. Here, the unlawfulness of the arrest may also make the handcuffing excessive. Although it is true that excessive force claims based on unduly tight handcuffing ordinarily require physical injury, this general rule applies where the arrest itself is lawful. *See Neague v. Cynkar,* 258 F.3d 504, 505 (6th Cir. 2001). Without addressing the general issue of whether any degree of force used to effectuate an unlawful arrest is excessive, I believe that, *under the circumstances of this particular case,* the unlawfulness of the arrest is one more factor which militates against a finding that Officer Foubert is entitled to qualified immunity.

## B.  Was the Right Clearly Established?

Qualified immunity shields an officer from suit "when she makes a  decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen,* 125 S. Ct. 596, 599 (2004) (per curiam). In *Brosseau,* the Supreme Court clarified that the "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 599. The focus of this inquiry must be upon whether the

---

[4]*Cf. Burch v. Naron,* 333 F. Supp. 2d 816, 825-26 (W.D. Ark. 2004) (in tackling case, concluding that, although the force used was not extraordinarily violent, a jury should decide whether any force was necessary under the circumstances).

officer had fair notice that his conduct was unlawful. *Id.* Thus, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* The Court explained that

> reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

*Id.*

I do not read *Brosseau* to require that, for notice purposes, prior case law must be factually identical to the case *sub judice.* "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer,* 536 U.S. 730, 741 (2002). The *Hope* Court explained that "although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Id.* Hence, the issue is not whether prior case law presents identical, or even substantially similar, facts, but whether those cases would have put a reasonable officer on notice that his conduct would violate a constitutional right.

In *Brosseau,* the Supreme Court left open one avenue by which a plaintiff may circumvent the notice requirement. In an "obvious" case, a constitutional violation can be clearly established even without a body of relevant case law. *Brosseau,* 125 S. Ct. at 599. I conclude that the law was sufficient to place Officer Foubert on notice that his action would violate Lyons's constitutional rights and that this is an obvious case in which a body of case law is not necessary.

The events in question occurred in August 1998. At that time, it was clearly established that, before tackling a suspect to the ground, an officer should give the suspect an opportunity to voluntarily surrender. *Cf. Barlow v. Ground,* 943 F.2d 1132 (9th Cir. 1991) (finding that tackling an arrestee for merely knocking over a sign and placing him in pain compliance hold was excessive); *McNew v. Pleasant,* 1992 WL 162255 (N.D. Ill. 1992) (unpublished) (finding that, where officer failed to identify himself or ask for the suspect's cooperation, the suspect "could have been stopped by simply grabbing him more firmly instead of immediately tackling him and kneeing him in the back"); and *Vathekan v. Prince George County,* 154 F.3d 173 (4th Cir. 1998) (recognizing a right to be free from attacks by police dogs without a verbal warning) (citing *Kopf v. Wing,* 942 F.2d 265 (4th Cir. 1991)).

Regardless of the status of the law in August 1998, I believe that reasonable officers would know, even without specific guidance from the courts, that tackling a woman who is merely resisting an unlawful arrest in her own home, without giving her fair warning, is unconstitutional. Thus, I place this case under the "obvious" rubric established by the Supreme Court in *Brosseau* and conclude that a body of relevant case law is not necessary.

Accordingly, I would affirm the district court's denial of summary judgment to both officers.