RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0404p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GEORGE A. VANCE,

*Plaintiff-Appellant,*

No. 07-5930

*v.*

BLAINE WADE et al.

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 00-00213—Dennis H. Inman, Magistrate Judge.

Argued: June 4, 2008

Decided and Filed: November 17, 2008

Before: DAUGHTREY and MOORE, Circuit Judges; DUGGAN, District Judge.[*]

---

## COUNSEL

**ARGUED:** Michael M. Raulston, LAW OFFICES, Chattanooga, Tennessee, for Appellant. Kent E. Herrin, HERRIN & BOOZE, Johnson City, Tennessee, Ronald W. Jenkins, HERNDON, COLEMAN, BRADING & McKEE, Johnson City, Tennessee, for Appellees. **ON BRIEF:** Michael M. Raulston, LAW OFFICES, Chattanooga, Tennessee, for Appellant. Kent E. Herrin, HERRIN & BOOZE, Johnson City, Tennessee, Julia C. West, WEST & ROSE, Kingsport, Tennessee, for Appellees.

MOORE, J., delivered the opinion of the court, in which DUGGAN, D. J., joined. DAUGHTREY, J. (pp. 11-12), delivered a separate opinion concurring in the result.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. In this lawsuit involving claims of excessive force, Plaintiff-Appellant George A. Vance ("Vance") appeals the grant of summary judgment to

---

[*] The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

Defendants-Appellees Captain Blaine Wade ("Wade"), Detective Jim Breuer ("Breuer"),[1] and the city of Bristol, Tennessee. In June 2000, Vance filed this lawsuit under 42 U.S.C. § 1983, alleging that on June 10, 1999, officers Wade and Breuer used excessive force in handcuffing and securing him during the execution of a search warrant at his business and that the city of Bristol, Tennessee, failed to train and supervise its officers. Vance's lawsuit also involved state-law claims for false arrest and assault and battery. The case was stayed pending the resolution of criminal proceedings in state court against Vance, and in April 2005 the parties consented to the exercise of jurisdiction by a U.S. Magistrate Judge. In July 2007, the magistrate judge issued a Memorandum Opinion and Judgment granting Wade, Breuer, and Bristol's motions for summary judgment, in particular finding that Wade did not use excessive force in handcuffing Vance and that Wade, although he *did* use excessive force in shoving and cramming Vance in the backseat of a police vehicle, was entitled to qualified immunity on that claim. In this appeal, Vance focuses his challenge to the judgment primarily as it pertains to Wade. Although we agree that Vance's allegations are insufficient to support an excessive-force claim for handcuffing, we disagree that Wade is entitled to qualified immunity on the excessive-force claim relating to Wade's actions in placing Vance in the back of a police vehicle. We therefore **REVERSE** the magistrate judge's order granting summary judgment on Vance's claim of excessive force relating to Wade's actions in shoving Vance inside the police vehicle, **AFFIRM** the magistrate judge's order granting summary judgment in all other respects, and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

On June 10, 1999, the Bristol Police Department simultaneously executed seven search warrants for gambling machines at various locations in the city. The police began executing these warrants at 6 p.m. Captain Wade was the ranking police officer in charge of the overall planning and execution of the warrants, and Detective Breuer was the designated team leader for executing the warrant at Tooties Restaurant, a business in which Vance had an ownership interest. Captain Wade, along with Assistant District Attorney Gene Perrin ("Perrin"), was at Tooties Restaurant when the police department began executing the warrant, but Wade left for another raid location shortly thereafter.

Vance arrived at Tooties Restaurant some time after Wade left. Upon his arrival, Vance noticed several people standing around outside the restaurant as well as several police cars. Vance claimed that when he entered the restaurant and asked Breuer what was going on, Breuer responded by saying "[w]e're closed." Joint Appendix ("J.A.") at 200 (Vance Dep. at 31). Vance replied that the restaurant was his business and asked whether the police had a search warrant. Breuer stated that the officers did have a search warrant and, after Vance requested to see the warrant, Breuer asked another officer to show a copy to Vance.

Vance alleged that Breuer was screaming at him to sit down, and that Vance's response was to tell Breuer that "this is not an arrest warrant." J.A. at 201 (Vance Dep. at 32). At that time, a phone began ringing in the restaurant, and Vance asserted that Breuer prevented him or anyone else from answering the phone. In his deposition, Breuer stated that "[i]t's not common practice during a search warrant to allow anyone to answer the phone within." J.A. at 171 (Breuer Dep. at 38). Vance claimed that he demanded to use the restaurant phone and call his lawyer,[2] that Breuer refused to allow him to do so as he was not under arrest, and that Vance then asked to be arrested so that he could call his lawyer. J.A. at 201 (Vance Dep. at 32). Vance alleged that Breuer then

---

[1] Although the parties inconsistently spell his name both "Breuer" and "Brewer," the record seems clear that his name is spelled "Breuer." *See* Joint Appendix ("J.A.") at 121 (Bristol Tennessee Police Department Individual Training Record for James Breuer); J.A. at 167 (Dep. of James J. Breuer).

[2] Breuer did not recall Vance requesting to contact his lawyer. J.A. at 171 (Breuer Dep. at 36).

faced up to him with "killer eyes" and told him that "[y]ou're not calling your lawyer." *Id.* At that point, Vance claimed that he "looked around in [the restaurant] and I said, 'Everyone in here keep your eyes on Mr. Brewer [sic] and myself. Don't take your eyes off of us. He's getting ready to violate my civil rights.'" J.A. at 202 (Vance Dep. at 33).

Breuer and Perrin then conferred, and Breuer decided to call Captain Wade back to Tooties Restaurant because he believed that Vance's behavior was "interrupting our search warrant" and that the officers "couldn't do the—the job we were there to do with—with this going on with this man." J.A. at 171-72 (Breuer Dep. at 39-40). Even Vance admitted that Breuer asked him to sit down "[t]hree or four times" and that he had not done so. J.A. at 205 (Vance Dep. at 36).

When Wade arrived, Vance alleged that Wade handcuffed him and that Wade "grabbed both hands and jerked them behind me fast, quick, hard, and cuffed the same time almost instantly, crammed down on them and then jerked up on them. You know how tall he is. Brought me up on my toes. Had me on my toes and marched me all the way out" of the restaurant.[3] J.A. at 208 (Vance Dep. at 58). Vance stated that around "50 people" had gathered in the parking lot outside the restaurant. J.A. at 207 (Vance Dep. at 56). Vance claimed that Wade "set me down" in a police vehicle and that Wade left him "[s]itting on the edge of the seat" with his feet on the ground and the door open. J.A. at 209 (Vance Dep. at 59); J.A. at 218 (Vance Dep. at 67).

Vance testified that while he was sitting on the edge of the seat, Wade and Breuer had an argument and "they talked for five minutes." J.A. at 218 (Vance Dep. at 67). Vance claims that when Wade returned to the vehicle, he said "[g]et in there," and pushed Vance into the car, "cramm[ing] my head down on my shoulder." J.A. at 219 (Vance Dep. at 69). Vance testified that Wade "took his hand and put [it] on my shoulder and he twisted the upper trunk all the way around. Then he ran out of reach so he swapped hands and put his hand there to give him more leverage. And then he took this hand and he crammed my head down on my shoulder." *Id.* Vance stated that "at that time I was hung. My hips were hung in the vehicle. I couldn't break loose. Finally they broke loose, thank the Lord. My hips broke loose and I fell face forward into the floorboard, laying in the floorboard. My knees were right on the running frame of the car" J.A. at 219-20 (Vance Dep. at 69-70). Vance then testified that Wade "just took the door and shut it up like that and pushed my body in there" and that while the door did not close on his legs, instead "[t]he door pushed them in, crammed me in there." J.A. at 219-20 (Vance Dep. at 69-70).

Vance stated that it was hot outside that day, around ninety degrees, and that the windows of the car were rolled up. J.A. at 211 (Vance Dep. at 71). Vance claimed that, while he was down in the backseat and struggling to get into an upright position, he was "holler[ing] at" the auxiliary police officer and that the response initially was "[s]ilence." J.A. at 220 (Vance Dep. at 70). In his brief, Vance claims that he was in the backseat "for Ten to Fifteen (10-15) minutes" while the auxiliary officer "ignored him" until Vance mentioned having had surgery and currently having back pain. Appellant Br. at 5. When Vance was able to right himself and lean forward, he then "pecked on the plexiglass" and attracted the attention of the auxiliary officer sitting in the front seat. J.A. at 211 (Vance Dep. at 71). Vance then stated that after he got the officer's attention, the officer asked him what he wanted, and Vance replied that "'you'd better get back here and loosen these cuffs, I don't have no feeling in my hands, you've hurt my neck and you've hurt my back.' I said, 'I've had back surgery.' I said, 'I'm in therapy now.' I said, 'You've hurt me.'" J.A. at 212 (Vance Dep. at 72). Vance stated that the officer "evidently believed me," that the officer left the vehicle and walked over to Wade, who then returned to the vehicle with Breuer, who removed the handcuffs after asking if Vance would behave. *Id.*

---

[3] The officers apparently do not recall who handcuffed Vance. J.A. at 172 (Breuer Dep. at 41) ("After this lawsuit was filed a year after the fact we tried to figure out amongst ourselves who handcuffed him and we can't remember."); J.A. at 253 (Wade Dep. at 17) ("Q. Okay. Did you handcuff him? A. No, sir.").

As the magistrate judge noted, Vance "claims that he suffered injuries to his neck and lower back as a result of the force utilized by Captain Wade in handcuffing [him] and forcing him into the floorboard of the rear of the police vehicle." J.A. at 394 (Mem. Op. at 5). In his Statement of Undisputed Material Facts in Opposition to the Motion for Summary Judgment, Vance noted his deposition testimony that he "sustained injuries to my neck and lower back," that "[s]ince June 10, 1999, I had surgery on my neck," and that he has "also sustained emotion and mental anguish and incurred attorney's fees." J.A. at 358.

Vance, however, admitted that he did not ask the officers to take him to the hospital or provide any medical aid or assistance. J.A. at 222 (Vance Dep. at 100). On the night of the search, Vance's daughter-in-law, Maggie Vance, took several photographs of Vance's wrists. J.A. at 360-61 (Notice of Filing Copies of Photographs as Exhibit); J.A. at 370 (Jane Vance Dep. at 45).[4] Although Vance argued to the district court that the force from the handcuffing "cause[d] bleeding, cutting and bruising in the outside and numbness of his hands," J.A. at 346 (Resp. to Mots. for Summ. J. at 3), the photographs show only what appears to be a very small bruise on one wrist and absolutely no lacerations or blood. On appeal, Vance asserts only that the handcuffing caused "damage to his writs [sic]." Appellant Br. at 17. Furthermore, although the handcuffing occurred on June 10, 1999, the sole medical evidence in the record pertaining to Vance's alleged injuries is an "Independent Medical Evaluation" report from November 2001. J.A. at 71-82, 73. The report, however, is neither sworn nor accompanied by a sworn affidavit, and therefore it offers no support to Vance. *See Pack v. Damon Corp.*, 434 F.3d 810, 815 (6th Cir. 2006) ("Although the district court relied on both the Bukowski Report and the Quillen Affidavit, the Bukowski Report is unsworn and thus is hearsay, which may not be considered on a motion for summary judgment."). Finally, after the officers finished their search of Tooties Restaurant on June 10, 1999, Vance voluntarily provided a two-page statement to the officers about the gambling machines in the restaurant. The statement pertains only to the asserted legality of the machines and does not contain any complaints of injury or reference to police misconduct. The statement bears the signatures of both Breuer and Vance and was commenced at 6:45 p.m. on June 10, 1999, and completed at 7:37 p.m. that same night.

In June 2000, approximately one year after the execution of the search warrant at Tooties Restaurant, Vance filed this lawsuit pursuant to 42 U.S.C. § 1983. Because criminal proceedings against Vance were ongoing in state court—the charges concerned the gambling machines that the officers seized on June 10, 1999—Vance's § 1983 lawsuit was stayed for several years.[5] In April 2005, the parties consented to the exercise of jurisdiction by a U.S. Magistrate Judge.

In March 2007, the city of Bristol, Wade, and Breuer moved for summary judgment, and Vance filed a response in April 2007. On July 10, 2007, the magistrate judge granted summary judgment to the defendants. As to the primary issue on appeal—the excessive-force claims arising out of Wade's alleged actions in tightly handcuffing Vance and cramming him in the backseat of the police vehicle—the magistrate judge found that Vance's handcuffing claim failed because the handcuffs were removed when Vance complained. J.A. at 397-98 (Mem. Op. at 8-9). However, regarding Vance's excessive-force claim for being pushed into the car, the magistrate judge found that although the "question is *extremely* close in light of *Lyons v. City of Xenia*," 417 F.3d 565 (6th Cir. 2005), "under the plaintiff's version of the facts, there was a constitutional violation." J.A. at 402 (Mem. Op. at 13 & n.4). However, the magistrate judge found that Wade was entitled to qualified immunity.

---

[4] Although the parties failed to include copies of the photographs in the Joint Appendix, the photographs were part of the record before the district court and have been supplied to this court.

[5] Vance was tried and convicted in Tennessee state court of aggravated gambling promotion, and his conviction was affirmed on appeal in April 2004. *State v. Vance*, No. E2003-00110-CCA-R3-CD, 2004 WL 746296 (Tenn. Crim. App. April 8, 2004).

On July 25, 2007, Vance timely filed a Notice of Appeal.

## II. ANALYSIS

Although Vance's appellate brief lists three issues in its "Statement of Issues for Review" section, our analysis below pertains only to the second issue, whether "Captain Blaine Wade use[d] excessive force in violation of Mr. Vance's civil rights." Appellant Br. at 2. Before undertaking that analysis, we briefly address the other two issues and explain why they merit little attention.

The third "issue" stated in Vance's brief consists of the following sentence: "[t]he Appellant does not seek redress for the lack of procedural due process pursuant to Rule 26 of the *Federal Rules of Civil Procedure*." Appellant Br. at 2. Later in his brief, Vance simply repeats this sentence. Appellant Br. at 18. Accordingly, we do not address this contention or concession.

The first issue stated in Vance's brief is whether "Defendant Jim Breuer violate[d] Mr. Vance's civil rights and negligently inflict[ed] mental anguish." Appellant Br. at 2. Vance devotes exactly eight lines of text in the "Argument" portion of his brief to this claim and includes a single citation to a Tennessee Supreme Court case. Appellant Br. at 9 (citing *Sallee v. Barrett*, 171 S.W.3d 822 (Tenn. 2005)). The exact nature of Vance's claim is also unclear: the section heading asks whether Breuer "*negligently* inflict[ed] mental anguish" but in text Vance asserts that Breuer's actions were "certainly an *intentional* infliction of emotional harm." *Id.* (emphases added). Vance provides the elements of neither claim. Moreover, Vance's Complaint and his Response to the motions for summary judgment do not refer to any such claim, J.A. at 4 (Compl. ¶ 22) ("In addition, the Plaintiff sues the Defendants for the state pendant [sic] claims of false arrest and assault and battery."); J.A. at 344-54 (Pl.'s Resp. to Mot. for Summ. J.), and the magistrate judge therefore understood Vance as raising only the state law claims of "false arrest and assault and battery." J.A. at 390 (Mem. Op. at 1).

Vance appears not to have raised below any claims for intentional or negligent infliction of emotional distress, and "the failure to present an issue to the district court forfeits the right to have the argument addressed on appeal." *Armstrong v. City of Melvindale*, 432 F.3d 695, 699-700 (6th Cir. 2006). Furthermore, even if Vance had presented such claims to the district court, "an issue is deemed forfeited on appeal if it is merely mentioned and not developed." *United States v. Clark*, 469 F.3d 568, 569-70 (6th Cir. 2006). Accordingly, we do not address Vance's argument that Breuer negligently or intentionally inflicted emotional distress.

## A. Legal Standards

"We review a district court's decision granting summary judgment de novo." *Burchett v. Kiefer*, 310 F.3d 937, 941 (6th Cir. 2002). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "In conducting the summary judgment analysis, we must view all inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party," which is Vance in this case. *Burchett*, 310 F.3d at 942.

We must also assess Vance's claim under the framework of qualified immunity. "According to the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court explained that the "initial inquiry" in the qualified immunity analysis is determining whether "the facts alleged show the officer's conduct violated a

constitutional right."[6]   "[I]f a violation could be made out on a favorable view of the parties' submissions," the Supreme Court then directed that "the next, sequential step is to ask whether the right was clearly established."  *Id.*   Finally, the Supreme Court elaborated that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.* at 202.  Accordingly, we have stated that "[w]e analyze claims of qualified immunity using a three-part test, which requires us to determine (1) whether a constitutional right was violated; (2) whether that right was clearly established and one of which a reasonable person would have known; and (3) whether the official's action was objectively unreasonable under the circumstances."  *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) (citing *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc)).

In evaluating the merits of a plaintiff's claim that officers used excessive force, we "must apply an 'objective reasonableness' standard."  *Griffith v. Coburn*, 473 F.3d 650, 656 (6th Cir. 2007) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)).  "Under this standard, 'the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'   The test is 'reasonableness at the moment' of the use of force, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Id.* (quoting *Graham*, 490 U.S. at 397, 396) (internal citations omitted).  Evaluating the reasonableness of a use of force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  In addition, "we have held that a plaintiff may allege use of excessive force even where the physical contact between the parties did not leave excessive marks or cause extensive physical damage."  *Ingram v. City of Columbus*, 185 F.3d 579, 597 (6th Cir. 1999) (citing *Holmes v. City of Massillon*, 78 F.3d 1041, 1048 (6th Cir. 1996)).

Finally, as to a claim that officers used excessive force in handcuffing an individual, "[o]ur precedents allow the plaintiff to get to a jury upon a showing that officers handcuffed the plaintiff excessively and unnecessarily tightly and ignored the plaintiff's pleas that the handcuffs were too tight."  *Burchett*, 310 F.3d at 944-45; *see also Lyons*, 417 F.3d at 575-76 ("[T]he plaintiff must allege some physical injury from the handcuffing, and must show that the officers ignored plaintiff's complaints that the handcuffs were too tight.") (internal citations omitted).

## B. Analysis

The argument section of Vance's brief regarding his excessive-force claim against Wade is disorganized and unclear.  *See* Appellant Br. at 9-18.  Roughly half of the argument section consists simply of a lengthy quote from an unspecified case.[7]   Appellant Br. at 12-17 (quoting, without citation or listing in the Table of Authorities, *Baker v. City of Hamilton*, 471 F.3d 601, 605-08 (6th Cir. 2006)).  Although Vance's argument lacks clarity, it appears that his argument involves two

---

[6] We note that the Supreme Court recently granted a petition for writ of certiorari and directed the parties "to brief and argue the following question:  'Whether the Court's decision in *Saucier v. Katz* should be overruled?'" Questions Presented, *Pearson v. Callahan*, No. 07-751, available at http://www.supremecourtus.gov/qp/07-00751qp.pdf (March 24, 2008) (internal citation omitted).  In the interim, we conduct our qualified-immunity analysis based on the law as it has developed in this circuit.

[7] The argument section also includes a lengthy quotation from a Tennessee state-court case concerning a governmental entity's waiver of immunity for negligent acts, after which Vance asserts that "[t]herefore, the City is not immune."  Appellant Br. at 12.  Because Vance's "Statement of Issues for Review" does *not* mention the city of Bristol at all, we do not address the city's liability, as it appears that Vance forfeited any claims he may have against the city.

excessive-force claims against Wade:  one relating to the tight handcuffing, and another relating to Wade's alleged actions in marching Vance out of the restaurant and shoving Vance into the backseat of the police vehicle.  We address each in turn.

### 1.  Vance's Claim that Wade Used Excessive Force in Handcuffing Him

We hold that Vance has failed to establish a constitutional violation in regard to his claim that Wade used excessive force in handcuffing him.  As stated above, for an excessive-force-in-handcuffing claim, our cases require that a plaintiff show both that officers handcuffed the plaintiff excessively and unnecessarily tightly and that officers "ignored the plaintiff's pleas that the handcuffs were too tight." *Burchett*, 310 F.3d at 944-45; *Lyons*, 417 F.3d at 575-76.  Vance clearly cannot establish the second element of showing that Wade ignored Vance's complaints.

Vance's deposition testimony shows that Wade promptly responded to Vance's complaints. Vance did testify that *another* officer—an auxiliary officer who is unnamed and not a party to this suit—sat in the front of the vehicle while Vance struggled to right himself and allegedly ignored Vance's verbal complaints for a period of approximately ten to fifteen minutes until Vance was able to right himself and "peck" on the glass to attract the auxiliary officer's attention.  J.A. at 211-12 (Vance Dep. at 71-72); Appellant Br. at 5.  Vance then testified that the auxiliary officer left the vehicle and spoke to Wade, who returned to the vehicle with Breuer, who removed the handcuffs. J.A. at 212 (Vance Dep. at 72).  Vance sued Wade, but Vance has not identified or sued the auxiliary officer. Most importantly, Vance's testimony demonstrates that Wade took prompt corrective action upon learning of Vance's complaints.

We therefore hold that Wade did not violate Vance's constitutional rights in handcuffing him because the handcuffs were removed when Wade learned of Vance's complaints. *See Burchett*, 310 F.3d at 945 (holding that no constitutional violation occurred when plaintiff "complained only once, and on that occasion, Sheriff Kiefer immediately offered to remove the handcuffs if Burchett would behave").

### 2.     Vance's Claim that Wade Used Excessive Force in Securing Him in the Police Vehicle

Vance appears to be asserting a second excessive-force claim that stems from "when he was escorted to the police car and then placed in it."  J.A. at 398 (Mem. Op. at 9).  The magistrate judge noted that the Supreme Court's decisions in *Muehler v. Mena*, 544 U.S. 93 (2005), and *Michigan v. Summers*, 452 U.S. 692 (1981), clearly permit an officer to handcuff and detain an individual during the execution of a search warrant.  J.A. at 396-97, 400-01 (Mem. Op. at 7-8, 11-12). Nonetheless, an officer may not use excessive force in doing so, and the magistrate judge concluded that, drawing all reasonable inferences from the evidence in favor of Vance, "under [Vance's] version of the facts, there was a constitutional violation."  J.A. at 402 (Mem. Op. at 13).  The particular acts that the magistrate judge found to have violated Vance's constitutional rights were Wade's actions in "pulling up on [Vance's] handcuffs while his hands were cuffed behind his back," in "shoving [Vance's] head and shoulder downward and essentially throwing [Vance] into the floorboard," and in "closing the car door to force [Vance's] legs into the car."  J.A. at 401-02 (Mem. Op. at 12-13).

We agree with the magistrate judge that these asserted actions could constitute an excessive use of force, and because a constitutional "violation could be made out on a favorable view of the parties' submissions," *Saucier*, 533 U.S. at 201, we proceed to the second and third steps of our qualified immunity inquiry:  "(2) whether that right was clearly established and one of which a reasonable person would have known; and (3) whether the official's action was objectively unreasonable under the circumstances." *Harris*, 513 F.3d at 511.  As the Supreme Court observed

in *Saucier*, "there is no doubt that *Graham v. Connor* clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier*, 533 U.S. at 201-02. Consequently, the crucial inquiry is whether Wade's "action was objectively unreasonable under the circumstances." *Harris*, 513 F.3d at 511; *Saucier*, 533 U.S. at 202 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*.") (emphasis added).

The Supreme Court's opinion in *Saucier* provides critical guidance in analyzing whether Wade's use of excessive force was objectively unreasonable under the circumstances in this case. In *Saucier*, the Supreme Court rejected the Court of Appeals' conclusion "that qualified immunity is merely duplicative in an excessive force case" given that the analysis for both excessive-force and qualified-immunity claims involve determining whether an officer's actions were "objectively unreasonable." *Saucier*, 533 U.S. at 203. Instead, the Supreme Court explained that "[t]he qualified immunity inquiry . . . has a further dimension" that "acknowledge[s] that *reasonable mistakes* can be made as to the legal constraints on particular police conduct." *Id.* at 205 (emphasis added). As a result, qualified immunity "protect[s] officers from the sometimes 'hazy border between excessive and acceptable force,'" and "in excessive force cases, . . . in addition to the deference officers receive on the underlying constitutional claim, qualified immunity can apply in the event the mistaken belief was reasonable." *Id.* at 206 (quoting *Priester v. Riviera Beach*, 208 F.3d 919, 926-27 (11th Cir. 2000)).

Applying the *Saucier* analysis—and comparing the facts in this case to those in *Saucier*—we hold that Wade is not entitled to qualified immunity. In *Saucier*, the plaintiff's excessive-force claim involved allegations that military police officers used excessive force in arresting and securing the plaintiff, who was wearing a visible, knee-high leg brace, when he interrupted a speech given by Vice President Al Gore to celebrate the conversion of a military base to a national park. The Supreme Court noted that because it "granted certiorari only to determine whether qualified immunity was appropriate, . . . we will assume a constitutional violation could have occurred under the facts alleged." *Id.* at 207. The Supreme Court nonetheless held that the military police officer was entitled to qualified immunity despite the plaintiff's allegations of a "'gratuitously violent shove' . . . when he was placed into the [military] van" because "[a] reasonable officer in petitioner's position could have believed that hurrying [the plaintiff] away from the scene . . . was within the bounds of appropriate police responses." *Id.* at 208.

Although the facts in this case and those in *Saucier* are similar, this case involves a substantial difference: Vance asserts that Wade escorted him to a police vehicle, left that scene for several minutes, and *then* returned to Vance and forcibly crammed him into the floorboard of the vehicle. Further, although both cases involved a degree of tension and concern for keeping order, the level of tension and danger in this case was considerably lower. *Saucier* involved a demonstrator protesting a speech by the Vice President, whereas in this case a large crowd of approximately fifty people were standing outside a restaurant where officers were executing a search warrant for illegal gambling machines.

The time delay between Wade escorting Vance to the car and Wade's later actions in cramming Vance into car is the decisive factor that renders this case substantially different than *Saucier*. Certainly, Wade arrived at the scene with the understanding that Vance was being uncooperative, and Vance's own deposition testimony confirms that he had refused to comply with Breuer's repeated requests to sit down and allow the officers to conduct the search. *See* J.A. at 403 (Mem. Op. at 14) (observing that "the situation confronting Captain Wade from his perspective" was that "he had been called back to Tooties by fellow officers because [Vance] was argumentative and uncooperative; [Vance] himself acknowledges that he was still arguing loudly with Investigator Breuer when he was handcuffed by Wade"). Wade also relied upon an affidavit from Professor Jerry

E. Loar, "the Dean of the Division of Public Safety, as well as an Associate Professor of Criminal Justice, at Walters State Community College in Morristown, Tennessee," J.A. at 400 (Mem. Op. at 11), in which Professor Loar opined that "it was reasonable to handcuff Mr. Vance and remove him from the premises in order to minimize the risks to officers and in order that the search could continue." J.A. at 316 (Loar Aff. at 5).

The problem, however, is that Vance alleged that Wade used this force well *after* securing Vance and defusing the situation. Had Wade, in a decisive effort to minimize risks and calm a potentially volatile situation, simply escorted Vance to the car and proceeded immediately to shove Vance into the car and cram him into the floorboard, this case would more likely fall in "the sometimes 'hazy border between excessive and acceptable force'" in which qualified immunity would properly operate to protect an officer from suit. *Saucier*, 533 U.S. at 206 (quoting *Priester*, 208 F.3d at 926-27). The delay between initially placing Vance in the car and then returning after several minutes to cram him into the vehicle renders irrelevant Wade's reliance on the Loar Affidavit and his belief, upon initially arriving at the restaurant, that Vance had been uncooperative.

We confronted a similar situation in *Burden v. Carroll*, 108 F. App'x 291, 293-94 (6th Cir. 2004), a case in which we affirmed the district court's denial of qualified immunity against a claim of excessive force. We explained that "[a]ccording to the series of events as [plaintiff] Burden describes them, [officer] Carroll shoved Burton violently even though he already had adequate time to assess the situation and even though any reasonable officer would have concluded that neither Burden nor Shipman posed any safety or flight risk." *Id.* (footnote omitted). We concluded that "[b]ecause Burden alleges that Carroll [shoved him] well after the situation was secured, Carroll cannot claim that he was reasonably mistaken about the degree of force that was appropriate under those circumstances." *Id.* at 294. Similar to the officer in *Burden*, Wade had secured the situation by the time that he handcuffed Vance and escorted him to the police vehicle. Consequently, when Wade returned to the vehicle several minutes later, it was objectively unreasonable for him to believe that any further force was necessary to maintain order because it would have been "clear to a reasonable officer that [Wade's] conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The qualified immunity analysis "acknowledge[s] that *reasonable mistakes* can be made as to the legal constraints on particular police conduct," *id.* at 205 (emphasis added), but according to Vance's allegations, Vance had been cooperatively sitting handcuffed in the back of a police vehicle for several minutes when Wade returned and used force.[8] We therefore hold that Wade is not entitled to qualified immunity from Vance's claim that Wade used excessive force in cramming him into the back of a police vehicle.[9]

### III. CONCLUSION

For the reasons discussed above, we **REVERSE** the magistrate judge's order granting summary judgment on Vance's claim of excessive force relating to Wade's actions in shoving Vance

---

[8] We stress that the dispositive issue in this case is the delay between when Wade escorted Vance to the police car and when he shoved Vance into the back seat. It is possible that, absent such a delay, the same force used on Vance would be a constitutionally acceptable amount of force. In this case, viewing the facts in the light most favorable to Vance, we hold only that, given the delay between Wade's various actions, the circumstances would not have led a reasonable officer in Wade's position to believe that his actions were "within the bounds of appropriate police responses." *Saucier*, 533 U.S. at 208.

[9] The ultimate decision with respect to whether or not defendant Wade is entitled to qualified immunity depends on the jury's factual determination as to the actual events that transpired between Vance and Wade. The court ultimately decides the issue of qualified immunity. In this case, however, "The jury becomes the final arbiter of [Wade's] claim of immunity since the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury." *Brandenberg v. Cureton*, 882 F.2d 211, 215-216 (6th Cir. 1989).

inside the police vehicle, **AFFIRM** the magistrate judge's order granting summary judgment in all other respects, and **REMAND** the case for further proceedings consistent with this opinion.

--------

**CONCURRING IN THE RESULT**

--------

MARTHA CRAIG DAUGHTREY, Circuit Judge, concurring in result.  The majority in this case identifies as excessive force what the district court described as Captain Wade's action in "roughly shoving [Vance] into the police vehicle" and "essentially throwing [him] into the floorboard."   The district court held that this conduct, together with "pulling up on the plaintiff's handcuffs" and "closing the door to force plaintiff's legs into the car," was "objectively unreasonable."   The court concluded that "under the plaintiff's version of the facts, there was a constitutional violation," basing this determination on "the totality of the circumstances" and describing the call as "*extremely* close in light of *Lyons v. City of Xenia*, [417 F.3d 565, (6th Cir. 2005)]."  But the district court went on to hold that there was "no *obvious* constitutional violation in pulling up on the plaintiff's wrists" or in "forc[ing] the plaintiff into the police car as [Wade] did." (Emphasis added.)  As a result, because the plaintiff could not produce "'materially similar' case law that 'squarely governs' this case," the district court held that Wade was entitled to qualified immunity and granted his motion for summary judgment.

The flaw in this analysis by the district court is that the conclusion, purportedly based on the totality of the circumstances, fails to take into consideration all the relevant circumstances.  The error may have resulted from Wade's counsel's willingness to accept the plaintiff's version of the "undisputed facts" on its face, for purposes of resolving the motion for summary judgment by focusing on legal arguments (1) that the force used in securing Vance in the back of the police car was not excessive, based on the Supreme Court's pronouncement that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment," *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation and internal quotation marks omitted), and (2) that even if the district court found to the contrary, his client was entitled to qualified immunity, based on our opinion in *Lyons*.  Committed to prevailing on the legal questions as a way of securing immediate dismissal of the claims against Wade, his counsel did not develop the factual record, which would otherwise have signaled the district court that there was a material dispute of fact concerning the events alleged to constitute excessive force.

The record before the district court, and now before us, contains Captain Wade's deposition, in which he denies having handcuffed Vance, testifying that he had no handcuffs in his possession when he arrived at the scene and was not sure who did put handcuffs on the plaintiff.  He also denied walking Vance to the car or securing him in the backseat, testifying that after Vance was taken out of the restaurant, Wade next saw Vance seated in the backseat with the door closed.  This version of the facts is supported by the written statement Vance produced at the police station when he arrived there within the next half-hour.  In one-and-a-half, single-spaced, handwritten pages, Vance defended the legality of his gambling operation in detail, but never mentioned mistreatment by Wade or any of the other officers involved in his arrest.  Wade's deposition testimony is further buttressed by medical records showing that Vance did not seek treatment for the injuries he blames on Wade for a matter of months, supposedly because he could not get an appointment.  Finally, photographs taken of Vance's his wrists taken on the night of his arrest show no injury beyond a slight redness, despite Vance's allegations that Wade's use of force left his wrists cut and bleeding.

The existence of this fundamental dispute of fact should have prevented the district court from ruling on the defendant's motion to dismiss.  Summary judgment is not appropriate in the qualified immunity context "if there is a factual dispute . . . involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violated clearly established rights." *Buckner v. Kilgore*, 36 F.3d 536, 540 (6th Cir. 1994).  Simply put, when "the legal question of qualified immunity turns upon which version of facts one accepts,"

summary judgment cannot be granted. *Fisher v. City of Memphis*, 234 F.3d 312, 317 (6th Cir. 2000) (quoting *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 902 (6th Cir. 1998)). As a result, I agree with the majority that we should reverse the district court's judgment as to the "shoving" claim against Captain Wade and remand the case for trial, but not for the reason cited in the majority opinion. Because I would make it clear on remand that what actually occurred at the scene and whether it constituted excessive force are questions to be resolved by the trier of fact, I am unable to join in that opinion.