NOT RECOMMENDED FOR PUBLICATION

File Name: 20a0403n.06

Case No. 19-2346

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

S. BAXTER JONES,

     Plaintiff-Appellee,

v.

CITY OF DETROIT, MICHIGAN; SGT.
REUBEN FLUKER; OFFICER ROBIN
CLEAVER; SGT. EDWARD HUDSON;
COMMANDER ELVIN BARREN,

     Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)

FILED
Jul 14, 2020
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF
MICHIGAN

BEFORE: MOORE, SUTTON, and GRIFFIN, Circuit Judges.

SUTTON, Circuit Judge. Detroit police arrested Baxter Jones for disorderly conduct. They transported Jones, who uses a wheelchair, in a modified cargo van. Jones says riding in the van aggravated his spinal injuries and hurt his shoulders and hands. The district court denied the officers' motion for summary judgment based on qualified immunity. But the officers did not violate clearly established law based on Jones's observable physical needs, and Jones did not ask them to treat him differently. We reverse.

On July 17, 2014, protestors gathered to draw attention to water shutoffs in Detroit. They blocked the driveway of a city water contractor, preventing workers and vehicles from entering or exiting. Police arrested nine protestors, including Jones, for disorderly conduct. They

transported eight protestors in a police bus.  Because Jones uses a wheelchair, they transported him in a modified cargo van.

A video fully captures the next minute or so of the encounter.  Readers can watch the video for themselves.  https://www.opn.ca6.uscourts.gov/media/mediaopn.php.  Commander Elvin Barren asked Jones if officers could lift him into the van in his wheelchair.  Jones nodded yes.  Barren and three other officers lifted Jones, still in his wheelchair, into the van.  As they lifted him, someone said, "Watch his head!"  R. 62-6 at 1:33–1:35.  Consistent with the warning, an officer placed his hand on the back of Jones's head as it passed through the van door.  According to Jones, this aggravated a preexisting neck condition, and he felt a jolt of pain that brought tears to his eyes.  He said "something like ow" as he was moved into the van.  R. 34-5 at 73.  Sergeant Cleaver maneuvered Jones inside the van once the other officers lifted him in.  As Sergeant Cleaver maneuvered him into place, Jones complained to him that there was not enough room in the van.  But as the video shows, the wheelchair, with Jones in it, fit tightly into the back of the van.

The video also confirms that the officers did not change the existing restraints holding Jones in his wheelchair.  Once they had placed him in the van, they engaged his wheelchair's brakes and relied on an intern to ride with him and use his feet to keep Jones's wheelchair from moving in what the video confirms is a tight space moving from the right to left side of the van.  The van did not have any specialized wheelchair restraints.  The dissent, by the way, characterizes the events in the video differently.  We encourage the interested reader to watch the video for herself.

Jones waited in the van while the officers arrested the other eight protestors and loaded them into another vehicle.  He complained to the person in the back with him that he was in pain,

2

because he was forced to bend his head forward due to the van's low vertical clearance.

Once the van started moving, Jones says, his wheelchair jostled and bounced uncomfortably, with his head constantly in contact with the van's ceiling during the ride. He hit his head on the van's ceiling until he slouched down in his wheelchair, injuring his spine and hurting his hands and shoulders as he gripped the wheelchair's arms. Jones complained to the person riding with him and to the driver that he was in pain and should be transported with safety restraints. Jones's medical records indicate that he suffered spinal changes and increased pain after his arrest. He attributes them to his handling during the arrest and transportation.

Jones sued the city and the officers who loaded him into the van, arguing that they used excessive force to arrest and transport him and that they failed to accommodate his disabilities as required by the Americans with Disabilities Act, the Rehabilitation Act, and state law. 42 U.S.C. § 12132 *et seq.*; 29 U.S.C. § 794; Mich. Comp. L. § 37.1101 *et seq.* The defendants sought summary judgment based on qualified immunity. The district court granted summary judgment on all the claims except the excessive-force claims against the officers.

Summary judgment is appropriate when only one party has introduced sufficient material facts to support a jury verdict in its favor. If a jury could reasonably find for either of the parties, the case proceeds to trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Qualified immunity precludes liability for police officers except when they commit (1) a violation of the law (2) that is clearly established. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Jones bears the burden of establishing that the officers' conduct fails the test—that "each defendant officer, through his or her own individual actions, *personally* violated [his] rights under clearly established law." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015).

What does "clearly established" mean? It means that "existing precedent" put the "constitutional question beyond debate." *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quotation omitted). In the light cast by "pre-existing law," "the unlawfulness must be apparent." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quotation omitted). That is an "exacting standard." *Sheehan*, 135 S. Ct. at 1774. General excessive force principles, without more, may clearly establish a behavior's unlawfulness only in the most "obvious" cases. *White*, 137 S. Ct. at 552. In all other cases, especially those "present[ing] a unique set of facts and circumstances," courts must "identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment." *Id*. (quotation omitted).

Jones claims the officers used excessive force when they transported him in a van without using traditional safety restraints to secure the wheelchair and without enough headroom. But our cases say the opposite when it comes to the closest analogy, transporting non-wheelchair users. Faced with that question, courts within and outside our circuit have repeatedly rejected constitutional challenges to transportation of detainees without seatbelts. *Ingram v. Herrington*, No. 4:06-CV-P65-M, 2007 WL 2815965, *4–5 (W.D. Ky. Sept. 26, 2007); *Young v. Dep't of Corr.*, No. 04-10309, 2007 WL 2214520, *4–6 (E.D. Mich. July 27, 2007); *Spencer v. Knapheide Truck Equip. Co.*, 183 F.3d 902, 906 (8th Cir. 1999); *Taylor v. Stateville Dep't of Corr.*, No. 10 C 3700, 2010 WL 5014185, at *1–2 (N.D. Ill. Dec. 1, 2010) (collecting cases). Jones does not cite any contrary authority. The closest analogy, in other words, would not have warned the officers of a constitutional requirement to transport Jones only with the aid of safety restraints to secure the wheelchair. And those cases would not have shown that what the officers did do—allow an individual to hold the wheelchair in place with his feet in a tight space that left little room for movement anyway—violated clearly established law.

Our cases about transporting people in wheelchairs similarly tell the officers nothing about whether they transgressed constitutional boundaries in transporting Jones. Jones identifies just one case about transporting an arrestee who used a wheelchair. In *St. John v. Hickey*, 411 F.3d 762, 766 (6th Cir. 2005), police carried the plaintiff out of his house in his wheelchair, instead of using his wheelchair ramp. They dropped him on the way out. *Id.* He protested that he could not fit into the patrol car because his legs could not bend, but the officers attempted to bend his legs and put him in the car anyway. *Id.* They dropped him two more times in the process and injured his leg by pinning it between the car and the door. *Id.* On those facts, we found excessive force and denied qualified immunity. *Id.* at 771–75.

Only one other case in our circuit has involved a claim that an officer used excessive force while arresting a wheelchair user. That case upheld a jury verdict against an officer who pulled a paraplegic driver out of his car by his neck, dropped him on the ground, kicked and kneed him in the head, and dragged him across the ground by his forearms. *Koehler v. Smith*, 124 F.3d 198, at *5 (6th Cir. 1997) (table).

Our circuit thus has decided two cases about excessive force against wheelchair-bound suspects, and neither one could have alerted the officers to constitutional headroom, head-guiding, or safety-restraint requirements. The case's scarce forebears suggest it "presents a unique set of facts and circumstances" cutting in favor of qualified immunity, *White*, 137 S. Ct. at 552 (quotation omitted), not a constitutional rule that is "beyond debate," *Sheehan*, 135 S. Ct. at 1774 (quotation omitted).

To the extent cases from outside our circuit figure into the "clearly established" analysis—they usually do not, *Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020)—they tell the same story. No case to our knowledge, and none cited by Jones, elaborates a Fourth Amendment

standard for safety restraints, head-guiding, or headroom in transporting wheelchair users.

Two cases, it's true, involved safety restraint failures. In *Gorman v. Bartch*, officers violated the law when they removed a paraplegic arrestee from his wheelchair and tied him into a van with a combination of his own belt and a standard seatbelt. 152 F.3d 907, 909–10 (8th Cir. 1998). Gorman sued under the Americans with Disabilities Act. *Id.* at 909. But in today's case, the officers never removed Jones from his wheelchair. And *Gorman* at any rate held that qualified immunity shielded the officers from liability. *Id.* at 916.

In the second case, *Sayers v. City of New York*, officers transported a prisoner in his wheelchair in a police van. No. CV-04-3907, 2007 WL 914581, at *1 (E.D.N.Y. Mar. 23, 2007). The van had safety restraints, and the officers attempted to use them. *Id.* Sayers told them they had secured him incorrectly, but they ignored his complaints. *Id.* During the drive, Sayers tipped over backwards in his wheelchair, hitting his head on the window and fracturing his pelvis. *Id.* at *2. On those facts, too, the court granted qualified immunity, without announcing a constitutional rule that could apply to Jones's transportation. *Id.* at *4. Nothing, inside or outside our circuit, should have tipped off the officers to the existence of the constitutional rules Jones claims they violated.

Jones insists that the officers violated Detroit Police Department policy when they transported him in the cargo van. The policy requires that officers have a supervisor determine "the most appropriate method" for transporting disabled arrestees. R. 40-14 at 2. "Whether or not an officer is following police procedures is certainly relevant to the question of reasonableness in excessive force cases." *Mullins v. Cyranek*, 805 F.3d 760, 768 (6th Cir. 2015). But a policy violation "is not necessarily conclusive proof that the Constitution has been violated." *Id.* Whatever a policy violation might prove, no violation of the policy occurred. The

officers followed police procedures when the supervisor on the scene—Commander Barren—determined what he believed to be the most appropriate transportation method, a prisoner transport van. Jones's disagreement with Commander Barren's decision does not transform the officers' actions into a policy violation—or a constitutional violation.

Jones adds that *St. John* establishes that the officers violated clearly established rights by lifting him into the van while seated in his wheelchair. But he consented to being lifted in his wheelchair into the van.

Even if we analogize this lawsuit to handcuffing cases, it does not help Jones. In some situations, it is true, ordinarily reasonable police actions may injure arrestees, as happens occasionally with handcuffing. *See, e.g.*, *Lyons v. City of Xenia*, 417 F.3d 565 (6th Cir. 2005). In those cases, it is also true, an injured arrestee may show that the handcuffs obviously caused or exacerbated a problem, *Smith v. City of Wyoming*, 821 F.3d 697, 717 (6th Cir. 2016), or that she alerted the officer to her pain and asked for the handcuffs to be loosened, *Vance v. Wade*, 546 F.3d 774, 782–83 (6th Cir. 2008).

(By the way, the dissent, though not Jones, says *Vance* placed the officers on notice that they violated Jones's rights by putting him in a vehicle without sufficient headroom. *Vance* said nothing of the sort. The plaintiff in that case complained that an officer "took his hand and put [it] on [Vance's] shoulder and he twisted [Vance's] upper trunk all the way around." *Id.* at 778. The officer then used his hands and the door to shove Vance into the patrol car so that he "fell face forward into the floorboard," where he became stuck for the next ten to fifteen minutes. *Id.* at 778–79. That case told the officers nothing about how they should have transported Jones.)

Should officers have known, without a complaint, that their actions would hurt Jones? No. It was obvious that Jones used a wheelchair, and officers observed that Jones's head

touched the van's ceiling. But nothing about wheelchair use in general would have alerted a reasonable officer that Jones could not slightly bend his neck or lean forward to avoid hitting his head. The use of a wheelchair by itself does not show a pre-existing neck injury. And we have already explained that nothing clearly established the officers' duty to use safety restraints on Jones's wheelchair, as opposed to the use of the intern's feet to keep the wheelchair in place in the tight space in the back of the van.

Is there anything Jones said that should have alerted officers that their actions hurt him? Again, no. Take the events chronologically. Jones agreed to be lifted in his wheelchair into the van. That did not create notice. He said "something like ow" when an officer put a hand on his head as he passed through the van's doorframe. R. 34-5 at 73. But indistinct or generic expressions of discomfort do not place officers on notice. *See Henry v. City of Flint*, -- F. App'x --, 2020 WL 2520695, at *8 (6th Cir. 2020); *Standifer v. Lacon*, 587 F. App'x 919, 923 (6th Cir. 2014). He complained to Sergeant Cleaver that there was "not enough room in here" just after he entered the van. R. 34-5 at 82. But that remark, too, would not have put a reasonable officer on notice that Jones was suffering neck pain or physical injury.

True, Jones did complain once the ride and his posture caused him pain. That complaint put the people who heard it on notice that there might be a problem. But Jones voiced that complaint during the ride. The only people who heard it, according to Jones, were the unidentified van driver and the unidentified person riding in the back with him. Jones never claims that the four officers heard those complaints. And he does not argue that the four officers should be responsible on a supervisory, duty-to-protect, or failure-to-act theory. *See Fazica v. Jordan*, 926 F.3d 283, 289 (6th Cir. 2019).

Why didn't Jones sue the people who heard his complaint? He inquired about their identities in an interrogatory. The police department responded that it could not identify them. Best we can tell, Jones's only follow-up was to ask four witnesses during depositions if they remembered who drove the van or rode in the back. At oral argument, the officers' attorney explained that the van driver's name should be available in a record held by the State, outside the city's possession. When asked, Jones's attorney could not recall seeking the district court's aid in identifying the unknown driver and rider through discovery.

Because the officers did not violate any clearly established law, qualified immunity applies.

We reverse.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** The majority opinion is vise-like in its analysis of whether Jones's constitutional rights are clearly established. Rather than considering "'the salient question' in evaluating the clearly established prong," "whether officials had 'fair warning' that their conduct was unconstitutional," *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)), the majority frames the question at the most granular level. It concludes that "[n]o case . . . elaborates a Fourth Amendment standard for safety restraints, head-guiding, or headroom in transporting wheelchair users." Majority Op. at 5–6. If this definition of the constitutional right is not so narrowly defined as to "defeat[ ] the purpose of [42 U.S.C.] § 1983," then it is difficult to imagine what definition would be too narrow. *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012). The majority treats the fact that Jones is wheelchair-bound as a feature that makes it *less* likely that a reasonable officer would know that his actions violated our excessive-force precedent because few cases address arrestees in wheelchairs. But this misses the obvious point—because of Jones's apparent disability and because of the prevalence of persons without disabilities in our excessive-force precedent, we should conclude that this fact makes it *more* likely that a reasonable officer would be on notice that his treatment of Jones amounted to excessive force. Our caselaw about transferring persons who are observably disabled to police vehicles and about cramming persons who are not disabled into police vehicles establishes that nonviolent arrestees have the right to be free from unnecessary pain knowingly inflicted during an arrest, including when the arrestee is moved into and positioned within police vehicles for transport. Accordingly, a reasonable officer would have known that the force used during Jones's arrest, specifically the force used to move Jones into and position him within the police

cargo van for transport without being secured, was excessive and hence unlawful under the Fourth Amendment.

"A defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Schulkers v. Kammer*, 955 F.3d 520, 532 (6th Cir. 2020) (quoting *Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 724 F.3d 687, 695 (6th Cir. 2013)). To be clearly established, a right's "contours" must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* at 533 (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)). Notice to officials is the touchstone of qualified immunity. *Id.* "We do not require a prior, 'precise situation,' a finding that 'the very action in question has previously been held unlawful,' or a 'case directly on point.'" *Guertin*, 912 F.3d at 932 (citations omitted). If we did require such factual similarity, we would not be able to consider "the general reasoning that a court employs," in addition to "direct holdings" and "specific examples describing certain conduct as prohibited," to discern what rights are clearly established. *Baynes v. Cleland*, 799 F.3d 600, 612 (6th Cir. 2015). Indeed, both the Supreme Court and this court have rejected "rigid, overreliance on factual similarity." *Id.*

Jones argues that the defendants violated his clearly established Fourth Amendment rights when they lifted his wheelchair into the van and pushed his head down to get him inside the van, and then left him unsecured and crammed into the van for transport. Appellee Br. at 11.[1] At least two cases demonstrate that he is correct: *St. John v. Hickey*, 411 F.3d 762 (6th Cir.

---

[1] The majority helpfully includes a link to the video footage. Majority Op. at 2. Viewers should pay particular attention to the video at minute 1:46, which shows that Jones must keep his head down and his neck bent

2005), *abrogation on other grounds recognized by Marvin v. City of Taylor*, 509 F.3d 234, 246 n.6 (6th Cir. 2017)), and *Vance v. Wade*, 546 F.3d 774 (6th Cir. 2008).

In *St. John*, we addressed the transport of a person with a physical disability who was in a wheelchair. There, we concluded that the right at issue was "the right of a nonviolent arrestee to be free from unnecessary pain knowingly inflicted during an arrest" and that the right "was clearly established." 411 F.3d at 774. In *St. John*, the officers took the plaintiff out of his wheelchair and forced the plaintiff's rigid legs to bend in an attempt to place him in the back of a police cruiser. *Id.* at 771–72. The plaintiff was nonviolent; he was arrested for disorderly conduct, a non-serious crime; he did not present a risk to others or a risk of flight; and the circumstances were not remotely exigent as to require the officers immediately to force the plaintiff into the back of the car. 411 F.3d at 772; *see also id.* at 771 (setting forth factors courts consider in excessive-force cases, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight" (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989))).

This is how we should define the right at issue here. Jones was also a nonviolent arrestee and the portion of his arrest where the defendants pushed his head down is materially indistinguishable from the arrest in *St. John*. Jones was arrested for disorderly conduct, the same crime as the plaintiff in *St. John*; he did not present a risk of flight; he posed no threat to others; and there were no exigent circumstances necessitating his immediate transport or confinement in the van. Additionally, the defendants here were aware that they were causing Jones unnecessary

---

to avoid hitting the cargo van's ceiling. The majority argues that "Jones . . . fit tightly into the back of the van." Majority Op. at 2. It is worth pointing out that Jones also would have "fit tightly" in a multitude of spaces depending on how he contorted his body. But, semantics aside, it is most useful for our purposes to note that Jones could not straighten his neck and keep his head from hitting the ceiling because of the height of his wheelchair.

pain. First, it was readily apparent that he was wheelchair-bound, like the plaintiff in *St John*. *Id.* at 772. Second, Jones cried out, "ow," to the officers as they pushed his head down. R. 40-2 (Jones Dep. at 72) (Page ID #915). The fact that Jones did not apprise the officers of the specifics of his disability is not fatal to his case. In *St. John*, the plaintiff explained to the officers that his legs could not bend due to muscular dystrophy. 411 F.3d at 772, 775. But the issue was whether the officers were aware that they were causing the plaintiff, "an obviously disabled and wheelchair-bound man," pain—not that he gave a particular verbal warning. *Id.* To that end, we considered the plaintiff's verbal warning *and* the fact that he used a wheelchair. *Id.* at 775. The majority opinion interprets "knowingly" from *St. John* to require a particular verbal warning, even if the arrestee has an obvious disability that a reasonable officer would appreciate and has otherwise communicated his pain to the officers. This makes little sense.

Moreover, *St. John* also gave the defendants here fair notice that they could not leave a person with an apparent disability in an unsafe position. If officers cannot transfer an arrestee to a police vehicle using unnecessary force, it should be clear that they certainly cannot leave the arrestee in that physical position and avoid further constitutional liability. Even in *St. John*, the unlawfulness of leaving the plaintiff in the back of the police cruiser once his pain was apparent was so clear that the officers "attempted to return him to his wheelchair." *Id.* at 772.

*Vance* likewise demonstrates that the defendants violated Jones's clearly established right to be free from excessive force regarding how any arrestee, a person with a disability or otherwise, is transferred to and then left in a police vehicle. In *Vance*, we concluded that the defendants used excessive force in "cramming him in the backseat of the police vehicle." 546 F.3d at 780, 786. The defendants left the plaintiff facedown into the floorboard of the car for ten to fifteen minutes. *Id.* at 778–80. Critical to our analysis was that there was a low degree of

"tension and concern for keeping order." *Id.* at 785 (discussing the fact that the officer left the vehicle and then came back to forcefully stuff the plaintiff into the car). In Jones's case, it is undisputed that there was no tension and no concern for keeping order—it was a peaceful-protest demonstration. And though the level of force in *Vance* was arguably more egregious, the plaintiff in *Vance* was not a person with an obvious physical disability. Because Jones was in a wheelchair, a reasonable officer would have known that even less force was permissible to position Jones within the cargo van; he was left squeezed into the back of the van, his head and neck compressed due to the height of wheelchair. The majority points out that *Vance* does not discuss the transport of an arrestee. Majority Op. at 7. But *Vance* certainly discusses leaving an arrestee in a compromised position in a police vehicle. It is unclear how the fact that the vehicle in *Vance* was not yet moving factors into the majority's analysis without requiring unnecessary factual similarity. Based on our reasoning in *Vance*, the defendants were on notice that under these circumstances, their insistence on cramming Jones into the cargo van and leaving him there to be transported without being adequately secured was objectively unreasonable.

It is also important that in *Vance* it made no difference to the constitutional analysis that the plaintiff did not inform the officers he had just had neck surgery before being forcefully crammed into the police car. 546 F.3d at 779. Rather, this detail went to the extent of his injuries. *See id.*; *see also id.* at 783–86 (omitting mention of the neck surgery in the qualified-immunity analysis). The unreasonableness of the officers' actions in *Vance* was clear even without knowledge of the plaintiff's recent neck surgery. Such is the case here—Jones was wheelchair-bound and crammed into a van in a position that left him unable to keep his head from hitting the van's ceiling, to straighten his neck, or to stay in a secure, stable position. For these reasons, Jones had a clearly established Fourth Amendment right as a nonviolent arrestee

to be free from unnecessary pain knowingly inflicted during his arrest, including when he was moved into the cargo van and then left in a dangerous position for transport.[2]

I would affirm the district court, upholding its denial of qualified immunity. Thus, I dissent.

---

[2]The majority indicates that Jones should have named the officer driving the van and the officer that rode with Jones in the back of the van, and then it chastises Jones for failing to find the identities of these officers during discovery. Majority Op. at 8–9. Jones pursued the issue, but the City of Detroit stated that no records identifying these officers existed. R. 40-11 (Answers to Interrogs. at 1) (Page ID #990). It is unclear how Jones could have asked the district court to compel the defendants to provide what was presented as a non-existent record, much less divine that the true location of the records was with the State of Michigan—a fact that counsel for defendants disclosed during rebuttal at oral argument, three years into this case, and to which Jones was not afforded the opportunity to respond. Oral Arg. at 31:30–32:08.